THE STATE OF KANSAS, *on the relation of S. B. Bradford, Attorney General*, v. A. F. MALO, *as Sheriff of Gray County, et al.*

1. COUNTY-SEAT ELECTION — *Exclusion from Polling-Room — Corrupt Purpose.* The refusal of an election board, composed exclusively of the partisans of one town, in a county-seat election, to permit representatives of the opposing town to be present in the polling-room during the reception of the vote, is evidence of a corrupt and dishonest purpose in the conduct and result of the election.

2. CERTIFICATE, *Failure to Post — Fraudulent Purpose.* The failure of the judges and clerks of an election for the location of a county seat, immediately after the close of the vote, to make certificates of the number of votes polled, and post one on the outside of the polling-place, and forward the other, under cover, to the county clerk, is evidence of a fraudulent purpose.

3. VOTES, *Polled — No Public Statement of Number.* The neglect or refusal of the judges and clerks of an election to make any public statement, or to answer repeated inquiries as to the number of votes polled in the township or precinct in which they acted, is evidence of a dishonest purpose.

4. BALLOT-BOX AND BALLOTS — *Concealment — Evidence of Dishonest Purpose.* When the judges and clerks of an election so place the ballot-box that a voter cannot see or determine that the identical ballot he gave to the officer is deposited in the ballot-box; and when the member of an election board whose duty it is to receive the ballot from a voter so conceals the box from a voter by a movement of his body that the voter cannot see or determine that the identical ticket he gave the officer was deposited in the box; and when the member of an election board whose duty it is to receive the ballot from a voter stands in front of the box, and conceals it from the view of the voter, and is requested by the voter to stand aside so that

he can see that his ballot is deposited in the box, and the officer refuses to do so — all such acts are evidence of a dishonest purpose.

5. ELECTION RETURNS, *Stolen — Declaration of Canvassing Board.* The *prima facie* character of the declaration of the county board of canvassers is at once destroyed, when it appears that the party in whose favor the declaration is made destroys, suppresses, or steals the returns upon which it was based.

6. TOWNSHIP ELECTION RETURNS, *Reasons for Entirely Ignoring.* The returns of an election held in a certain township for the permanent location of a county seat must be entirely ignored when it is shown that the board of election would not permit any one of the opposing party to be present in the polling-room during the reception of the vote; that the board failed or neglected to make the certificate required by law as to the number of votes that were polled, and to post it on the outside of the polling-room; that the board refused to state or proclaim the number of votes polled; that by the fraud of the judges and clerks, assisted by outsiders, a greater number of votes were returned than there were voters in the township; and that these fraudulent votes were so mixed up with the honest vote that it could not be determined how many were honest and how many fraudulent, and no evidence was offered tending to show the result by the votes of the electors possessing the necessary qualifications.

7. TOWNSHIP ELECTION RETURNS, *Wholly Ignored — Facts Stated.* The returns of an election held in a certain township must be entirely ignored when it is shown that the election board is composed of members of a secret and oath-bound society, banded together for the purpose of selling their votes to that town for the permanent county seat of the county that would pay them the most money; that they had a promise of a large sum of money from one of the towns; that they were promised the sum of $100 to be divided between them; that one of the judges changed ballots, substituting for them ballots in favor of the town that had made such promises; that a large number of the members of the society voted, on the strength of this promise, for the town making the promise; that the board would permit no one of the opposing party to be present during the reception of the vote.

8. SECRET SOCIETY — *Votes of Members, Obtained by Promise of Money, Rejected.* In an election for the permanent location of a county seat, the votes of members of a secret society who pledged themselves by signature and oath to vote for that town for county seat that would pay the most money, and who voted for the location of the county seat for a town whose representative men had promised them a large sum of money to so vote, must be rejected, and not counted in favor of such town.

*Original Proceeding in Mandamus.*

APPLICATION by *The State*, upon the relation of S. B. Bradford, attorney general, for a writ of *mandamus* to *A. F. Malo*, as sheriff of Gray county; J. L. Cailey, as clerk of the district court; George B. Antrim, as county clerk; J. H. Williams, as county treasurer; E. J. Clark, as register of deeds; F. P. Hammer, as superintendent of public instruction; J. R. Brady, as probate judge; J. L. Bower, as county surveyor; and George W. Dunn, as county attorney of said county. The opinion, filed on June 7, 1889, contains an ample statement of the facts.

*Johnson, Martin & Keeler, Waters, Chase & Tillotson, Edwin A. Austin*, and *A. J. Bryant*, for plaintiff.

*G. W. Dunn, M. W. Sutton, J. T. Whitelaw*, and *C. N. Sterry*, for defendants.

Opinion by SIMPSON, C.: This is an original action in this court, commenced by the attorney general in the name of the state, to compel the defendants, who are county officers of Gray county, to remove their offices from the town of Ingalls to the town of Cimarron, alleging the latter place to be the permanent county seat of the county. The material allegations in the writ of *mandamus* are, that at an election held in Gray county on the 31st day of October, 1887, for the permanent location of the county seat, the town of Cimarron received seven hundred and fifty-three votes, and the town of Ingalls seven hundred and thirteen votes; that the returns of said election were duly canvassed by the board of county commissioners, and Cimarron declared the permanent county seat of said county; that notwithstanding that official declaration, the defendants named in the writ persist in keeping their offices at the town of Ingalls. To avoid the result as shown by the returns, the answer of the defendants to the alternative writ alleges that the returns from Foote and Logan townships

are false and fraudulent; that in these townships there existed a secret, oath-bound society, with an agreement that the members thereof would cast their votes for the permanent location of the county seat for the town that would pay them the largest amount of money for their votes; that this conspiracy consisted of about seventy-two resident electors of these two townships; that immediately preceding the election the members of this society were informed by their agents that the society had received a bond in the sum of ten thousand dollars, signed by prominent and responsible citizens of the town of Cimarron, conditioned that the sum of money mentioned therein was to be paid to the members of the society if they cast their votes for the town of Cimarron for permanent county seat; and that, acting under the belief that the bond was a valid one, and that the money would be paid according to its terms, forty-eight members of the society residing in Foote township, and twenty-four members residing in Logan township, each voted for Cimarron for county seat. The answer also alleges that the judge of the election, whose duty it was to receive the ballots from the voters in Foote township, changed at least ten ballots that were for Ingalls, and deposited in lieu thereof the same number of ballots for Cimarron; that the members of the election board in that township were all members of the secret society; that they all had knowledge of, connived at, and permitted the alleged fraudulent substitution of the ballots; and that the true results were different from the returns. The vote as returned from Foote township was one hundred and seventeen for Cimarron, and twenty-five for Ingalls. In Logan township there were returned for Ingalls sixty-nine, and for Cimarron thirty-five.

With respect to Cimarron township, the allegations of the answer are, that while there were returned by the election board four hundred and ninety-four votes for Cimarron and forty-five for Ingalls, in fact only four hundred and thirty-eight votes were polled, and of these Ingalls received at least one hundred, leaving only three hundred and thirty-eight for Cimarron; that the board of election in that township knowingly

and fraudulently permitted the ballot-box to be stuffed with seven or eight hundred fraudulent ballots for Cimarron; that they consumed unnecessary time in the count, waiting until they had learned the result of the other townships in the county, withholding all knowledge or declaration of the number of votes polled at that precinct, and then counted enough of the fraudulent ballots in the box to give a majority for Cimarron. The votes in controversy, then, are those from Foote, Logan and Cimarron townships.

It is claimed by the relator that in Cimarron township the agents of Ingalls were present all day at the polls or about the town buying votes for Ingalls for the county seat, and the evidence details circumstantially instances of voters who were bribed to vote for Ingalls. These are the principal questions for investigation and determination. The evidence is unusually voluminous, even for a county-seat case, aggregating over three thousand pages of printed matter. We have waded through the scum, filth, and mercenary degradation of this record, and find but little to commend in the action of either party. We must conclude as a matter of legal inference, from want of attack more probably than from any other circumstance, that there were some honest votes cast at that election. There is nothing left for us to do but to endeavor to give expression to the declarations of an honest majority. We hope and trust that we have found it rightfully.

Gray county was organized by proclamation of the governor, on the —— day of July, 1887. At the date of the filing of the memorial for organization of the county there were thirteen hundred and fifty-five voters returned by the census-taker. The vote for the temporary location of the county seat was as follows: For Cimarron, seven hundred and five; for Montezuma, five hundred and sixty; for Ingalls, eighty-eight; and for the center of Gray county, one. The temporary board of county commissioners divided the county into townships, named Cimarron, Montezuma, Ingalls, Hess, Foote, and Logan. Logan lies north of Ingalls, and Montezuma south; Foote lies north of Cimarron, and Hess south. The declared

result of the election of October 31, 1887, by townships is as follows:

| | INGALLS. | CIMARRON. |
|---|---|---|
| Montezuma | 236 | 30 |
| Hess | 195 | 60 |
| Ingalls | 143 | 17 |
| Cimarron | 45 | 494 |
| Foote | 25 | 117 |
| Logan | 69 | 35 |
| Totals | 713 | 753 |

The towns of Cimarron and Ingalls are both situated on the banks of the Arkansas river, and on the line of the Atchison, Topeka & Santa Fé Railroad; and they are about seven miles apart; Ingalls about twelve miles from the northern line of the county, and Cimarron about fourteen. The geographical center of the county is several miles south of the Arkansas river, the county being twenty-four miles wide from east to west, and thirty-six long from north to south.

I. For some time preceding the election, the people of Ingalls endeavored to make an agreement and perfect such an arrangement with the people of Cimarron as would have resulted either in an honest election or in furnishing undoubted evidence of a fraudulent one, if the negotiation had been successful. The proposition submitted by the representatives of Ingalls to those of Cimarron was this: They proposed to permit the citizens of Cimarron to select two reputable men to be present at the election and count in all the precincts of the county which were known to be favorable to the town of Ingalls for county seat, and in return asked to have two representatives present at the election and count in all the precincts known to be favorable to Cimarron for the county seat. These representatives of the respective towns were to be in the room in which the election was to be held in each of the precincts, to witness the reception of the ballots, the count, the sealing of the ballots in the boxes. They were to be permitted to inspect the poll-books before the same were sealed up and transmitted to the county clerk. This proposition was refused by the representatives of Cimarron. On the day of election, in all the precincts controlled by the partisans

of Ingalls, a representative Cimarron adherent was chosen as a member of the election board, except in Montezuma township; but in that township persons friendly to Cimarron were permitted to be in the polling-room during the entire time of receiving votes, counting them, and making returns. In the township of Ingalls one of the judges of the election was a Cimarron man, and voted for that town, and he states that he was put on the election board because he was a Cimarron man. In Logan township this matter was discussed at the time of the selection of judges and clerks of election, and it was agreed that one R. S. Moudy, who was known to be a supporter of Cimarron, should be one of the judges of election. He was chosen, acted as such, and voted for Cimarron. In Hess township R. J. Maxfield was elected as a member of the election board. He was a friend of Cimarron, and voted for that town. He testifies that it was general talk among the people who assembled to elect the board in the morning, that both sides should be represented on the board, and that he was elected because he was a Cimarron man. In Montezuma township a number of persons who supported Cimarron for the county seat were in and out of the polling-room during the entire day, coming and going at their pleasure. They were permitted to be where they could see the ballots cast during all the time, and see every voter that offered a ballot and the votes counted, and were also permitted to have two challengers on the outside. In the townships of Logan, Ingalls, Montezuma and Hess the Ingalls men were in the large majority, and had full and complete control of the polls and the selection of the election board. In the townships of Cimarron and Foote the friends of Cimarron were largely in the majority, and had control of the election, and the friends of Ingalls were not permitted to have either a judge or clerk of the election friendly to that town, nor was anyone representing Ingalls or the candidates for county offices on the Ingalls ticket permitted to have access to the room in which the election was held, during the day. It seems to be clearly established by these facts, that the propo-

.sition made by representatives of Ingalls to the Cimarron people preceding the election was made in good faith, and faithfully adhered to by the Ingalls men on the day of election, notwithstanding the refusal of the Cimarron people to accede to their request. It seems clearly established, also, that the refusal of the Cimarron people to allow Ingalls, and the candidates for county offices on the Ingalls ticket, to have representative friends in the polling-rooms of Foote and Cimmarron precincts, was because they intended to conduct the election in these townships in a corrupt and fraudulent manner. They denied to all those interested in Ingalls, and to all others who thought that for any reason the permanent county seat of Gray county ought to be located in that town, and to all those persons who were candidates for office on

1. Exclusion of representative friends from polling-room, evidence of corrupt intent.

what was known as the "Ingalls ticket," a right clearly given them by the statutes of this state. We consider this denial as a strong circumstance clearly indicating a fraudulent intent on the part of the Cimarron managers to dishonestly and corruptly conduct the election. And if there were no other facts pointing in the same direction, and this fact stood alone, we should require a strong showing to relieve it of that irresistible inference of bad faith and dishonest conduct that is inseparable from a refusal to let all see what was going on in the polling-room. If an honest election was intended, the adverse party would be invited to inspect every act. It is an unmistakable badge of fraud, and stamps every election board that refuses inspection, with a flagrant violation of the law at the threshold of its duty, and I believe ought of itself to be sufficient to cause the rejection of the returns of any township whose board of election pays no regard to the mandates of a law framed and passed for the express purpose of preventing and exposing dishonest practices at an election. Section 18 of the general election law provides:

"That the judges of election shall, if requested, permit the respective candidates, or one or more, not exceeding three, of their friends to be present in the room where the judges are during the time of receiving and counting the votes."

It is doubtless true that under some circumstances the mere refusal of the election board to permit candidates, or their friends, to be present in the room during the continuance of the election, when such refusal is unaccompanied by evidence of other fraudulent acts, is but such an irregularity as will not vitiate the returns. (*Gilleland v. Schuyler*, 9 Kas. 569.) But in cases where there is direct and positive evidence establishing the fact that there was perpetrated a gross and corrupt fraud, either by stuffing the ballot-box, by repeating, or by the manufacture of false and fraudulent poll-books and tally-sheets, then such a refusal becomes very important as sustaining the direct or circumstantial proof of the crime, by showing the preparation and opportunity for its commission. The construction sought to be given this statute by the election board of Cimarron township, that it had the right to say what persons among the opposition should be admitted, is a villainous one, and totally nullifies its provisions. The candidates have the sole and exclusive right to designate the persons who are to represent them in the polling-room, and the election board that suggests or expresses a preference for others should be regarded with suspicion. If this statute is obeyed, and its provisions observed, the frauds that have become an integral part of every county-seat election would cease to exist. It seems to me that this is the most important and effective provision that is made by the legislature to secure an honest election; that it is a matter of substance more directly affecting the conduct of the election than any other section of the statute regulating elections; that if it is faithfully observed, one of two things imperatively follows; and these are that either there is a fair election, or the evidence of fraud is primary and convincing.

We have neither the time nor inclination to reproduce here the repeated efforts of the Ingalls party to be allowed to have representatives of that town in the rooms in which the elections were held in Cimarron and Foote townships, and the persistent refusals of the adverse party to allow it. Suffice it to say that they made an honest effort to do so, and their

repeated failures only tend to more strongly impress our minds with the conviction that there was an evident purpose and predetermined design on the part of the Cimarron people to commit frauds in these two townships. There are many other circumstances that strengthen this conviction, and among the principal ones is the action of the county clerk in making the supplemental registration. Section 4, ch. 128, Laws of 1887, requires a supplemental registration to be taken by the county clerk daily from the time of his qualification until five days prior to the time fixed for the first election. The manner of making this supplemental registration list is prescribed by the act, and a form is prescribed, showing the date of the registration, the age and nativity of the voter, his place of residence, and requiring a description of his land, or the number of his town lots, and various other things that would make his qualifications certain, and his identity reasonably sure. The polling-list is prepared from the duplicate census schedule and the supplemental registration lists. In this case it is admitted that the county clerk, who was in the interest of Cimarron, made the supplemental registration lists in the following manner: He took the blank polling-lists and proceeded to put on them the names of persons having the qualification of electors, whose names appeared on the enumerator's census, and as voters came in to register supplementally he would register them on the several polling-lists; and these polling-lists, when complete, were sent to the election officers of the several election precincts, leaving on file in his office the enumerator's census, but no record of the supplemental registration until the polling-lists should be returned after the election. This is not the manner of making out the supplemental registrations pointed out by the statute, as by it there is no record of such registration left in the county clerk's office for public inspection. We have no doubt but that in this particular instance the manner employed was a deliberate design, and for a definite purpose. Repeated efforts were made to inspect the supplemental registration lists before the election, and copies were demanded, and fees tendered for that

purpose, but the clerk failed either to furnish copies or permit an inspection. One demand was enough to make of a public officer for an inspection of a public record. Any citizen of Gray county had the unquestionable legal right to inspect these supplemental registration lists, and take copies of them if he so desired, and it was the duty of the county clerk to furnish, on demand, the fees being tendered, a certified copy of the same. His refusal to do so was a gross abuse of an official trust, and is accumulated evidence of a dishonest purpose. It happens in this particular case that the polling-list, the poll-book and tally-sheet of the election held in Cimarron township on the 31st day of October, 1887, for the permanent location of the county seat of Gray county, and for the election of county officers, have all mysteriously disappeared, and, there being no original supplemental lists on file in the county clerk's office, by reason of his non-compliance with the plain requirements of the statute in that respect, the doors to every avenue of fraud were left wide open, and the accomplishment of the dishonest purpose made apparently easy.

In a word, every provision of the statutes of this state made for the purpose of preventing fraudulent and corrupt practices in the conduct and result of elections was wantonly disregarded by the election boards in Cimarron and Foote townships, and by the clerk of the county, and by all the officers whose duty it was to see that a free and fair election was held and an honest count had. These repeated omissions of duty and willful violations of positive requirements were not the result of ignorance or carelessness, but were produced by a settled determination to carry the election in favor of Cimarron by any means and at all hazards. No other construction can, with the slightest exercise of reason, be placed upon the action of an election board which deliberately refuse to allow representatives of an opposition sentiment to see and observe what takes place in the polling-room during the day, than that they intend to commit frauds, and permit dishonest and illegal votes to be deposited in the ballot-box. Their refusal to permit inspection is such a violation of law on their part as ought at

once to destroy the *prima facie* character of their returns. There can be no plausible excuse or fair explanation for such conduct. Such a refusal stamps their proceedings with such indelible fraud that it cannot be washed out by their subsequent attempts at vigorous verification.

In the case of *Smith v. Shelly*, 6 Cong. El. Cases, 40, it was held that a refusal on the part of the election board to permit a United States supervisor of elections to be present at an election for a member of congress was conclusive evidence of fraud. In two other cases, *Buchanan v. Manning*, 6 Cong. El. Cases, 287, and *Smalls v. Tillman*, 6 id. 430, returns were rejected because the supervisors were not permitted to be present. In *In re Duffy*, 4 Brewster (Pa.) 531, where under a statute of Pennsylvania there were overseers of elections, and they were driven away from the polling-room by the judges of election, it was held that improper conduct by the election board could be the only reason for a desire to keep the overseers away.

Chapter 128, Laws of 1887, p. 190, amending § 5, ch. 24, Gen. Stat., provides that immediately after the closing of the polls in county-seat elections the judges shall cause to be prepared two statements of the number of votes cast, which shall be signed by themselves and attested by the clerks, one copy of which shall be immediately posted on the outside of the voting-place, and maintained there until after the canvass of the votes by the board of county commissioners; the other statement to be immediately forwarded, under cover, to the county clerk of the county. The plain object of this provision is to prevent the judges and clerks of the election from returning a greater number of votes than were actually cast. It prevents them from withholding the returns from their township until they hear from others, and then increasing the number of votes polled in their township, to meet all the requirements of the occasion. Of course these objects are frustrated when the election board does not comply with the commands of this statute. While there is some little conflict in the evidence on this sub-

2. Failure to post certificate of number of votes polled; fraudulent purpose.

5—42 KAS.

ject, we are satisfied that the overwhelming weight of the evidence is to the effect that this requirement of the law was wantonly disregarded by the election board in Cimarron township.

We come now to the loss, theft, or suppression of the polling-list, the poll-books and the tally-sheets of the election in Cimarron township. On the 8th day of November, 1887, at the general election, county officers were elected for Gray county, and a person friendly to the town of Ingalls was elected county clerk. The returns of this election were not canvassed until the county commissioners were compelled to do so, by a peremptory writ of *mandamus*. Antrim, the person elected county clerk, procured a peremptory writ of *mandamus* against Pratt, who was in possession of the county clerk's office, to compel Pratt to turn the office over to him. Pratt evaded the service of this writ for some days, when a deputy sheriff, finding the room vacant, entered it, took possession, and placed Antrim in charge. He immediately, in presence of two witnesses, took an inventory of all books, papers, records and documents that were in the office at that time. The poll-books of every township in the county, except Cimarron, were found in the office. The next day after Antrim obtained possession of the county clerk's office, Pratt returned, acknowledged service of the writ, and told Antrim that all the books were in the vault of the Cimarron bank. Antrim had Pratt arrested for embezzling the census enumeration, but this was finally delivered to him by an officer of the Cimarron bank. Other witnesses testify to the same state of facts, with reference to the disappearance of these poll-books, tally-sheets, and the polling-list. When the officers friendly to Ingalls finally got possession of the county records, these important documents were missing, and they never have been found.

II. We are next to consider the allegations of the answer with reference to the conduct of the election in Cimarron township, and the evidence introduced to support them. We have already noticed the fruitless efforts of the friends of

Ingalls to have representation on the election board, or to have representatives of that town, and of the ticket known as the "Ingalls ticket," in the polling-room. We have also commented on the suspicious manner in which the supplemental registration was made. Reference also has been made to the theft of the poll-books and tally-list of this township. We cannot escape the conclusion that these returns were stolen, or suppressed, by the friends of Cimarron. No possible motive has been shown, and in the nature of things none can exist, for the disappearance of these poll-books and tally-lists, except the necessity to make the proof of the fraud which was perpetrated that day at Cimarron difficult and unsatisfactory. While the other facts established clearly demonstrate that

5. Election returns, stolen; destroys prima facie character of declaration of canvassing board.

every preparation was made and an opportunity was created for the commission of the fraud, the disappearance of these returns is a conclusive circumstance showing that the opportunity was utilized, and the crime committed. The *prima facie* character of the declaration of the board of canvassers is at once destroyed, when it appears that the party in whose favor the declaration was made steals or destroys the evidence upon which it is based. It is said by Greenleaf, vol. 1, §37—

"That the presumption of innocence may be overthrown, and a presumption of guilt be raised, by the misconduct of the party in suppressing or destroying evidence which he ought to produce, or to which the other party is entitled."

When a party voluntarily destroys written evidence, he must show that it was innocently done, before he can be allowed to give secondary evidence of the contents of the writings destroyed. (*Joannes v. Bennett*, 5 Allen, 169; *Tilton v. Beecher*, Sup. Ct. N. Y. 1875; *Bagley v. McMickle*, 9 Cal. 430; *Tobin v. Shaw*, 45 Me. 331.) In the case of *Blade v. Noland*, 12 Wend. 173, it was expressly held that "where a party has voluntarily destroyed a written instrument, he is not allowed to prove its contents by secondary evidence, until he has repelled every inference of a fraudulent design in its destruction." (See also the cases of *Pollock v. Wilcox*, 68

N. C. 46; *Blake v. Fash*, 44 Ill. 302; *Rudolph v. Lane*, 57 Ind. 115.) So, if a party withholds papers which would explain doubts, the doubts must be to his prejudice. (*Atty. Gen'l v. Windsor*, 24 Beav. 679.) If the charge be of fraud or misconduct, and the production of the papers would establish his guilt or innocence, the jury will be amply justified in inferring guilt from the unexplained fact of their non-production. (*Clifton v. United States*, 4 How. [U. S.] 242.) The maxim is that every presumption is made against the wrongdoer. (Broom, Leg. Max., 5th Am. ed., p. 633.) It is said in support of the rule:

"If a man by his own tortious act withhold the evidence by which the nature of the case would be manifested, every presumption to his disadvantage will be adopted."

And again:

"Where the party has the means in his power of rebutting and explaining the evidence adduced against him, if it does not tend to the truth, the omission to do so furnishes a strong inference against him."

The legal effect, then, of the destruction or suppression of the poll-books and tally-sheets of the election held in Cimarron township by the friends of that town, is not only to destroy the *prima facie* character of the returns, but to cast upon them the burden of proving, circumstantially and in detail, every vote cast at that election. This they have not attempted to do, and we start in the investigation of the vote in that township confronted with the fact that the best evidence is destroyed, and the secondary evidence is meager, detached, and unsatisfactory; and it will be almost impossible to credit the town of Cimarron with what we believe to be all the honest votes that were cast in its favor. We say this because in all cases it is very desirable that all honest ballots shall be counted, notwithstanding the fact that there may exist such a state of affairs as authorizes the court, acting in accordance with well-established rules, to reject the whole returns as untrustworthy and unreliable. In every case of this character there is still left a certain number of votes that are

admitted to be honest, or that could be easily proved to be so if ordinary diligence is exercised; and no matter how grievous the wrong committed by the election board, and how actively the great body of the supporters of the town assisted in the perpetration of the fraud, still the disposition is, and should be, to count every honest ballot that can be established as such.

The question is, how many votes were polled in Cimarron township? On one side, it is alleged that there were five hundred and thirty-nine votes cast; on the other, it is claimed that there were but four hundred and thirty-eight. To sustain the allegation that there were five hundred and thirty-nine votes polled, there is: First, the five hundred and thirty-nine ballots on file in this court; second, the evidence of one of the judges and one of the clerks of the election as to the number of persons voting; third, the evidence of the temporary county clerk as to the number of names on the polling-list; fourth, the evidence of Williams, Hoover, Berry, Lemert, and others, giving the population of the town of Cimarron and the country included in the township; the result of a preliminary canvass, and the expectation of the number of votes that would be polled. These witnesses were early settlers, and had knowledge of the population of the town and surrounding country. To sustain the allegation in the answer that only four hundred and thirty-eight votes were polled, are the following: First, on the 8th day of November, 1887, at the general election, at which all county officers for Gray were to be elected, only three hundred and fifty-five votes were polled; second, the evidence of Tracy, Goodwin, Baron, Etrick, and others, who, before the election, made repeated enumerations of the voters in Cimarron township; third, a list of voters made by the person appointed by this court as commissioner to take the evidence, made from the census enumeration, with those voters who made affidavits at the polls; fourth, the evidence of those persons who kept the number of votes polled during the day on the outside; fifth, the repeated declarations of one of the judges of election

at the close of the polls; sixth, the vote of G. W. Dunn, the time it was cast, its number on the poll-book, and the number of the last vote that was cast a few numbers after Dunn's; sixth, a subpena was issued for one hundred persons who were claimed to have voted in that township, and the officer to whom it was directed returned that they could not be found. We shall not stop to comment upon the unusual manner in which the sole power to designate persons to act as judges and clerks of the election was delegated to a single individual, because, no matter how the board was constituted, they were *de facto* an election board. The polling-room fronted on a street, was about eight feet wide and twenty feet long, had a door and dirty windows in front. Back of this room was a vacant one, and alongside of it a shed-room with an outside door. Doors opened from the polling-room into the vacant one in the rear and into the side shed-room. The voting-place was surrounded by a wire fence, and fifty feet away there was a gate with armed guards stationed on each side of the gate. One voter at a time was permitted to enter the gate and go to the polls. The ballots were received at the door, it being opened a few inches for that purpose. Numerous armed men surrounded the polling-place and marched up and down the streets. During the day no one friendly to Ingalls was permitted to be in the polling-room. Very soon after the voting commenced, the friends of Ingalls placed a man on the outside of the polling-room, and he kept the number of votes polled during the entire day. He made frequent inquiries of the judges and clerks of the election as to the number of votes polled. He would also challenge a vote, and then get the number of the vote challenged, and thus verify his list. He made an inquiry of the election board at the close of the polls, as to how many votes were polled, and was told by Wicks, one of the judges of election, four hundred and thirty-eight. This witness is corroborated to some extent by Wright, Goodwin, Dunn, Carver (one of the clerks), Dickson (one of the judges), and others. An affidavit made by the judges and clerks of the election on the 4th day of

November, 1887, and published as a reply to a sworn statement of Edward Artt, that was published on the 1st day of November, states that Wicks told Artt that the total number of votes cast was four hundred and thirty-nine. It is claimed on the other side, that Tracy, the man who kept the tally on the outside, was drunk, and was careless and inattentive, and that many persons voted that he did not notice; that the reason Wicks told Tracy and Artt that there were only four hundred and thirty-nine votes polled was because he found that if "the gang of toughs," that were in Cimarron from Dodge City, knew that there were over five hundred votes polled they would destroy the ballot-box. It appears that the judges and clerks of the election did not know at the close of the polls the number of votes Tracy had listed; and the fact that his number corresponded with the number Wicks said had been polled, is a very remarkable and suggestive one. Another very insinuating fact is found in the evidence of Geo. W. Dunn. This gentleman testifies that he voted as late as 5 o'clock in the afternoon; it was almost dark; that one McGill, a prominent resident of Cimarron, who all day had been absent from the town in another township, was notoriously the last man to vote in Cimarron on that day; that from the time he voted until McGill deposited his ballot it would be impossible for more than thirty or forty persons to vote; that on the day of the county canvass he saw the poll-book of that township, as presented to the county board to canvass, and that his number on that poll-book was 405, while McGill's number was 539. If these things were not true, how easy it would have been, by the production of the poll-books, to disprove them, and all the other damaging presumptions that hang around these election proceedings.

During the months of August and September, 1888, and during the time the evidence in this case was being taken by a special commissioner appointed by this court, several subpenas were caused to be issued for one hundred and eighty-four persons, whom it was alleged had voted in Cimarron township at this election. These subpenas were issued by the

special commissioner, and directed and delivered to a special marshal of the court, appointed to serve process. The marshal returned that one hundred and fifty-four of these persons could not be found. Their exact locations were specified in the subpenas. If they resided in the town of Cimarron, the number of their lot and block was given. If they resided in the country, the quarter-section, township and range were designated. The force of this return is attempted to be broken by several witnesses, who testify that about the time of the election, and for some months prior thereto, persons of that name were about the town, and a dim recollection is indulged in as to what they were doing, and, in some instances, who they worked for. It is not within the range of fair probabilities that one hundred and fifty-four men could drop out of the every-day life of a quiet country village, and there would be no one left to tell with some reasonable certainty where some of them could be found, within a year after their departure. Their disappearance is not satisfactorily explained, and it may be seriously doubted whether they had any existence in, or connection with, the town of Cimarron. In connection with this fact, it must be recollected that within eight days after the county-seat election there was a general election, at which county officers for Gray county were to be chosen, and at this election but three hundred and fifty-five votes were polled in Cimarron township. This shows a decrease of the vote in eight days of one hundred and eighty-four, and is a circumstance of such significance as to require a very lucid explanation. No satisfactory solution of the cause of such an exodus of voters is given. No friend of the town of Ingalls was permitted to know until the second morning after the election, how many votes were claimed to have been polled at the election. Repeated inquiries by numerous persons, made after the polls were closed, and up until the second morning, failed to elicit answers from those who were in a position to know the exact state of the polls. The judges and clerks who testify, state that about daylight of the morning after the election, they had completed the count, and de-

posited the poll-books, tally-sheets and polling-list in the vault of the Cimarron bank. The night succeeding the election, the judges and clerks assembled at the county clerk's office—that being situated in a building adjoining the bank —and took the election returns from the bank vault, and carried them to the clerk's office. The transparent pretense for this movement was an expressed desire to guard the election returns, and protect them from an anticipated raid by the toughs employed by the partisans of Ingalls. C. J. Dickson, one of the judges of the election in Cimarron township, testifies:

"The ballot-box was taken out of the bank by the board about 3 or 4 o'clock on the afternoon of Tuesday, and was taken up-stairs in the county clerk's room, where all the judges and clerks were present, except Mr. Day; and they all went into the room with the returns, and all the board stayed in the room that night with the returns, except himself. He stayed there only about five minutes; and he stayed at the head of the stairs, on a bale of hay, that night; and his brother stayed with him at the door all night; that he, Wicks and Perry delivered these returns to the county clerk two days after the election."

This statement must have been made on the assumption that there is no limit to human credulity. There is an old Scottish phrase descriptive of an individual who was always complaining about Providence frowning upon him, which can be applied to this judge of election—he has been "sinning his mercies." It would be a queer exercise of reason to determine that the returns were safer on the outside of the vault than within, and our great wonder is that it never occurred to the fruitful minds of this election board that by taking the returns out of the bank vault to a quiet room up-stairs, there would be an opportunity created to manufacture some poll-books and tally-sheets. While there are other facts and many more circumstances that go to strengthen our conviction that there was gross and outrageous fraud perpetrated in this township, we will not enter into the details of other transactions. Those already commented on are sufficient to convince the

most incredulous mind that the returns from this township are not worthy of any credence. There is no trace of honor, no pretense of fairness, nor any attempt to obey the law, discernible in them. No member of the adverse party was permitted to witness the reception of the ballots and their deposit in the box. No certificate of the number of votes cast was posted on the outside of the polling-place. The number claimed to have been cast, as shown by the pretended returns, did not accord with the declaration of one of the judges on the night of the election. No public announcement of the number of votes polled was made until the second morning after the election. The election returns were stolen or suppressed immediately after the canvass. The supplemental registration lists were made in such a manner that no record of them was left in the county clerk's office. Everything was done that would render the ascertainment of the honest vote difficult and unsatisfactory. False, fraudulent and dishonest poll-books and tally-sheets were manufactured and substituted in place of those used on the day of the election. The election returns from Cimarron township do not show the true state of the polls. The evidence does not disclose what the honest vote was. It is impossible for us to estimate it, and the return is rejected, and will not be considered.

3. No public statement of number of votes polled.

6. Township election returns, reasons for entirely ignoring.

III. As to the townships of Foote and Logan, the evidence discloses the same reckless determination on the part of the friends of Cimarron, in the conduct of the election in Foote township, not to allow any inspection by the friends of the town of Ingalls of the reception of the votes. The election board was composed exclusively of the friends of Cimarron. The judge of election who received the votes, Israel Herr by name, was a candidate for trustee of Foote township. His opponent was Mr. Marble, who made a demand that some one of his friends, or that he would be permitted to be in the polling-room during the reception of the ballots. A similar demand was also made on behalf of the town of Ingalls, but

they were all refused. The attention of the election board
was called to the provisions of the statute in this regard, with-
out avail. The election in Foote township was held in a sod
building, about 10 by 14 feet in size. There was a door
opening to the south, and windows in the east and west sides.
Herr, who received the ballots, was stationed at the east win-
dow. This window was composed of four lights, 10 by 12
inches. The ballot-box was placed on a table near the center
of the room, and about six feet from the window. Herr was
a large man, weighing in the neighborhood of one hundred
and eighty pounds, and as he received a ticket from the voter
and turned around to go to the ballot-box, the voter could not
see whether he deposited his ballot in the box, or not. Nu-
merous complaints were made about this, and toward noon
they became so frequent that all the persons in favor of In-
galls were ordered by the board of election not to come nearer
the polls than fifty feet, and a barbed wire was stretched be-
fore the polling-place to keep them away. The polls were
surrounded by armed men, who were partisans of Cimarron.
There is in the record the evidence of Black, Simpson,
Wm. McCloskey, Smith, Shoemaker, Roffins, Neidiger, J. F.
McCloskey, Masters, Watson, Lee, Tinsley, Hill, Edwards,
A. J. Switzer, Lindsay, and T. J. Switzer, showing how Herr
placed himself, so that they could not tell whether the tickets
they handed him were placed in the box, or not.

H. P. Lee, one of the judges of election, testified that—

"He, with Israel Herr and Townsley Roby, were judges
of election in Foote township; that Frank Kirchner and
James E. Wilson were the clerks; and that Herr received the
ballots; polls were held in a sod building 10x12, or 10x14,
having one door in the south, and two windows, one in the
east and the other in the west. Herr was located at the east
window, where he received the ballots, and witness was south
of him, near the window. Herr is now in California. Bal-
lots were handed in at the east window. He put one ticket
in the box every time, and there was a name checked off. He
had an extra ticket in his hand. He took tickets out of his
pocket frequently, and made passes to his left pocket, where

he had Cimarron tickets. He received tickets from voters with his right hand, and deposited tickets with his left hand, and no one was in the room but the judges and clerks when the votes were received, except one time when Charles Bishop and some others brought dinner. There was no Ingalls man. A demand was made on behalf of Ingalls for admission on the morning of election, but was refused by the board; and no one as a friend of Ingalls was allowed in the room during the day. A wire fence surrounded the polling-place, about fifty feet distant. In the morning two persons acting as challengers for either place, were allowed at the window, and until noon; after that the board, who were all Cimarron men, ordered all Ingalls' men outside the wire fence. They were ordered not to challenge by writing or any other way. There were 14 or 15 armed men there acting as deputies — all Cimarron men — and were inside and outside the limits of 50 feet. Herr told him he knew every man's vote who voted, by flipping the top of the ticket. Every time I noticed him at all, I could see the end of a ticket in his hand, and he made frequent passes to his vest pocket. He tore up one ticket he said was an Ingalls ticket. They let no one stay in the house who was friendly to Ingalls, until the count took place. Herr had every opportunity to change ballots. He had Cimarron tickets in his left vest pocket; saw him put them there. The voter from the outside could not see where his ballot went. Objections were raised just before dinner; still louder complaint among the voters as to Herr's position and manner of handling the ballots, and then Herr ordered everybody to stay outside the wire fence. Roby, also a Cimarron man, seconded it. He left a short time after the election. All the board belonged to the secret organization except Roby. This witness voted for Cimarron."

Frank Kirchner, who was a clerk at the election, says:

"Israel Herr received the ballots at the east window. When a ticket was handed in by the voter, Herr took it; Roby hunted the names on a register, and when the name was found, called the name, and the clerks wrote it down. Herr stood at the south side of the ballot-box, where he could stand with his back to the voter, and between him and the ballot-box, and when the name was being checked Herr would examine the ticket, while holding another ticket in his hand. If it was a Cimarron ticket, Herr would place it in the box; if it was an Ingalls ticket, he would twist his hands over and slip

another ticket around and just look at it, but would take it just as it was folded and put it in the box. Frequently his hand would visit his vest pocket. Saw him folding up Cimarron tickets and putting them in his vest pocket. When the polls were opened for the voters, witness told Herr to set the ballot-box close by the window, and as a ballot was handed him, to take it between his thumb and fore-finger, and pass it right into the box, so that every man that put his vote in there could see just exactly where his ballot went; and Herr told him to attend to his own business, and if he did not they would get somebody that would, and witness then said it was 'all right—just go ahead.' Herr set the ballot-box a little more than half-way in the room from the east window, on the table. The box and table were about six or seven feet from the east window, and Herr stood between the window and the box. The voter standing outside could not see whether his ballot was deposited. Saw Herr change tickets that were handed him. Saw him change eight or nine. 'He might have made some changes that I did not see,' but is positive he saw Herr change at least eight or nine by substituting other ballots for those handed him. Was a member of the secret organization. At its meetings, when Dunlap was not present, Herr read the oath and by-laws to persons joining, and either Herr or Dunlap administered the oath. Voted for Cimarron. Witness was about six feet from Herr when he was taking the ballots. Did not see inside of any ballots that Herr received, or read one, but did see him change tickets. Saw Herr put his hand into his vest pocket quite a number of times, both in the forenoon and afternoon. In the forenoon there was a man from Ingalls and one from Cimarron outside the window, and the board was in the room. Called Wilson's [the other clerk] attention to what he saw; saw him [Herr] change ballots eight or nine times. He put the ballot he received in his vest pocket, right-hand side; saw his hand go into his left-hand pocket and take out tickets folded up. He took tickets handed him with his right hand. When he received a ticket he got his back to the voter, facing west, and would hold ticket up and take hold with his left hand and turn them back. Witness sat in front and a little to the right of Herr — about three feet away. Deputy sheriffs with guns kept the men outside of the wire fence; done by order of the board. The election was peaceable — no quarreling or threats of any kind. In the forenoon a challenger for each side was allowed at the window. In the afternoon both were excluded beyond the wire fence."

This evidence is rendered the more trustworthy because of the refusal of those controlling the election in this township to admit representatives of those in opposition to their sentiments to the polling-room. It may be safely said in every case when such a refusal is made, that the parties making it intended a fraud, and wanted no witnesses present to see its perpetration. The position of the ballot-box away from the window, the action of Herr, his disappearance shortly after the election, and his wholesale verification at so late a period, are all of themselves suspicious and damaging. These things all lead to the conclusion that he was there for the express purpose of actively aiding in the commission of frauds by changing ballots; and we have no doubt but that he did so, and that there were credited to the town of Cimarron more votes than were actually received. The concealment of the ballot-box from the view of the voter so that he could not determine whether the identical ballot that he delivered to the member of the election board was deposited or not, is evidence of a dishonest purpose. And when a suspicious voter requests that he may have an opportunity to see his ballot deposited in the box, and this is refused, there cannot be any risk in resolving all doubts against the judge of an election who so conducts himself. We believe from the evidence that at least ten tickets containing the name of Cimarron for permanent county seat were substituted for that number of tickets containing the name of Ingalls which were handed to this member of the board of election, and that he fraudulently changed the same for the dishonest and corrupt purpose of defeating Ingalls, and to secure success to the town of Cimarron. One arises from a perusal of the pages of this accumulated villainy with a suspicion that it is rotten from rind to core — and so we have found it.

We now come to consider a branch of the case where bribery, intimidation, forgery, perjury and foul conspiracy ooze from every page of the voluminous record; and the more it is considered, and the more thoroughly it is examined, the more the noxious thing smells. It is alleged that there existed in

4. Concealment of ballot-box and ballots; evidence of dishonest purpose.

Foote and Logan townships a secret organization that was called the "Equalization Society," whose pretended object was the protection of its members against town rings, tricksters, and shysters, but whose real purpose was to sell the vote of its members to that town for the permanent location of the county seat which would pay them the most money. The meetings were held at night, and were secret; the men were bound together by blood-curdling oaths to vote as a unit. A meeting of this secret organization was held on Friday, October 28. An assurance was given by some one at this meeting that if the society voted as a unit for the town of Cimarron for the permanent county seat, the sum of ten thousand dollars was to be donated. A committee of the members of the society was appointed to go to Cimarron and procure the money or its equivalent. The persons active in this negotiation and agreement were one Dunlap, who it seems organized the society, and Reeve, a prominent and active partisan of Cimarron. This society was composed of seventy-two or seventy-three members, two-thirds of whom resided in Foote township, and the remainder in Logan. While the greater portion of the members were originally for Cimarron for the county seat, a minority consisting of nearly one-third were for Ingalls. When a new member joined, the by-laws were read to him, and these pledged the members to vote solidly together for their protection; and then an oath was administered, and the penalty for its violation was death. The committee appointed to go to Cimarron were Dozier and Chipman, and they were instructed to receive $10,000 in money, or a bond for that amount signed by fifteen responsible citizens of the town of Cimarron. If a bond was taken, the money was to be paid on the day after the election, and a meeting of the society was called for Tuesday evening for the purpose of making an equitable division of the corruption fund. The committee went to Cimarron on Saturday before the election, and not being able to get the money, a bond was delivered to them containing the following conditions:

"Know all men by these presents, that we, the undersigned

citizens of Gray county, Kansas, do hereby bind ourselves in the sum of ten thousand dollars, unto J. L. Dozier, of Gray county, Kansas.

"The conditions of this bond are such that, if the association in the northern part of Foote township, Gray county, Kansas, organized for the protection of the best interest of its members, shall, on Monday, October 31, 1887, cast a solid and united vote for Cimarron for the permanent county seat of Gray county, and said association shall furnish proof of such voting to the undersigned on Tuesday, November 1, 1887, before this bond is paid. And it is further agreed that if any member of aforesaid association shall give information to Ingalls, or anyone, so that this bond and transaction shall become known to Ingalls or the general public, then this bond shall become void, and of no force or effect either in law or in equity.

"This bond to be paid Tuesday, November 1, 1887, after furnishing evidence as aforesaid, and delivering the votes as aforesaid; and then and there to be void if not so complied with.

| | | |
|---|---|---|
| T. H. Reeve. | A. B. Mayhew. | J. Y. Coffman. |
| J. Q. Shoup. | E. M. Ratcliff. | A. D. Wettick. |
| H. A. Barnett. | John Perry. | D. Beathom. |
| W. M. Findly. | G. C. Nichols. | L. L. Ady. |
| J. C. Stewart. | Max. Lawrence. | A. T. Riley." |

The existence of this society is established conclusively, the evidence on both sides stating in detail its organization. That its main object and primary purpose was to vote for that town for the permanent county seat that would pay them the most money, is also so clearly set forth in the record that there is no reasonable doubt but that its character was wholly and purposely mercenary. The men who composed its members are satisfactorily identified, and they consisted of resident electors of Foote and Logan townships. These things are so conclusively established by the evidence that we have no doubt of their absolute truth. In Foote township, where the greater portion of the members of this secret organization voted, two of the judges of the election and both of the clerks belonged to the society. There is evidence tending very strongly to show that the election board in this township were to receive an additional sum of one hundred dollars, to be divided

between them, for their important services at this election. While there is a strenuous denial of this independent and disconnected scheme of corruption, we are inclined to believe that such a promise was made as an inducement to the dirty work performed by this board on that day. That the members of this society voted for the town of Cimarron, influenced and controlled by the promise of money, we entertain no doubt; but when we come to determine the exact number of votes and the names of the voters, the proof is not so satisfactory. There were a number of witnesses who testified very frankly that they voted for Cimarron to get a share of the "boodle." There are others to whose actions must be applied the inferences and presumptions naturally arising from their conduct. Of the first class, Dozier says he voted for Cimarron, and expected to get his part of the money. Bulwin says he was naturally for Ingalls, but voted for Cimarron; "wanted the boodle." Geo. W. Feagans swears that he was for Ingalls, but voted for Cimarron: "Wanted my part of the boodle." Sanner swears: "Ingalls was my natural choice; voted for Cimarron because they offered money." William Ziese: "Voted for Cimarron, but Ingalls was my choice; thought I'd get some money for my vote." Gus. Ziese: "Voted for Cimarron; thought I was going to get a big lot of money out of it." John Lepard: "Voted for Cimarron; didn't have any other choice, but the reason was because Cimarron made the best offer." J. J. Estes: "Was informed that Cimarron had made a bond before I voted, and to vote for Cimarron; I voted for Cimarron; I don't know how I would have voted if it had not been for that, but expect for Ingalls; I said I never would vote for Cimarron for anything." Levi Owens: "I was originally an Ingalls man, but thought a little money would be more good than the county seat." Andrew J. Gibson: "Voted for Cimarron; had no preference for county seat; I was there for money." Thomas Estes: "Voted for Cimarron; Kopp told me on election day it was all right; I had not thought to vote for any other place than Ingalls, except for this."

Of the other class, comprising the remaining members of

the society, who were not so refreshingly frank as to come upon the witness stand and proclaim their mercenary lust, there are a number of facts in the record that prove that the by-laws and oath were observed by all those belonging. When the committee came back from Cimarron, word was given out that "it was all right." Persons were selected, or before that time had been appointed, to see the members and see how they voted, and to keep a list of all those voting, and to be prepared to prove to signers of the bond that the vote had been cast according to contract. McGill and Kopp attended to this matter in Logan township. They stood at the gate leading to the polls, and as each of the organization men walked in, Kopp would say "This is all right" to McGill, who was the editor of a newspaper at Cimarron. Then McGill would take down the names, so as to know that all the members residing in Logan township had voted. Kopp furnished the tickets to
8. Secret society; the voters. We have no hesitation in declaring
votes of mem-
bers, obtained our belief that every member of the secret society
by promise of
money.      who voted at that election in Foote and Logan
townships for Cimarron did so induced solely by the belief that by so doing he would receive a proportionate share of the $10,000 in consideration for his vote. It makes no difference where their natural inclinations would lead them, whether to Ingalls or Cimarron — the controlling fact is that they were bound together to get the most money for their votes; and the fact that some of them were for Cimarron is not a mitigating one, but aggravates their offense, because they would be guilty of robbing their friends if their scheme had succeeded and they had received their money.

We are glad to record the fact that payment of the bond was refused on the ground that it is a forgery. The persons whose names are signed thereto swear that they never signed the bond, or had any knowledge of its existence until after the election. We hope this is true; but as it is entirely immaterial to us whether the bond was executed in fact or is a mere forgery, we have no occasion to express the very strong conviction we have on the subject, for it was just as effective

as a bribe, whether signed or forged.   Some sympathy ought
to be bestowed upon a people who have borne all the dis-
comforts and inconveniences of a pioneer life, and who have
made many sacrifices to build up a town, with the fond hope
that some day it would be a county seat, and that they would
be remunerated by the increased value of property, when their
future prospects are darkened by a swarm of vulturous specu-
lators, and in the frenzy of their disappointment they commit
some lawless acts; and yet their misdeeds are pleasant things
to contemplate when compared to a secret, oath-bound con-
spiracy, composed of men who have no honest choice in-
fluenced by either personal interest or public convenience, but
are willing to vote this way or that way, depending entirely
upon the amount of money that is placed in their hands.   Such
a conspiracy, governed by such a motive, and controlled by
such means, could never have originated elsewhere in the state
of Kansas but in the actual presence of a county-seat contest.
It would be an everlasting disgrace in the years to come, and
always fresh and vivid as now, if the ballot-boxes of Kansas
were permitted to be tainted by this supreme villainy.   Judi-
cial condemnation has no language with which to befittingly
characterize a crime that violates the first law — the spirit and
the essence — of this government.   In the presence of such a
high crime, what a miserable excuse, what an abject apology
it is to urge that the bond is a forgery, and of no value.   It
is a satisfaction to learn that the degraded wretches who sold
their votes for a hope or a promise that they would be re-
warded, were in turn cheated out of the proceeds of their
villainy by a forgery.   This comes as near a justifiable or ex-
cusable forgery, probably, as it can ever be approached.   One
of its good effects was to open the lips of the oath-bound
conspirators, and, induced by an unmanly feeling of spite,
many of them told the truth about its purposes and objects.
The election board of Foote township was controlled by this
secret organization, and the members thereof were influenced
by an independent promise of $100.   They wantonly disre-
garded the law, and would permit no one among those who

differed with them to witness the reception of votes. The other members of the board knew that Herr was changing ballots. · A large number of the voters were corrupted by the action of the secret society. And all these things are not only sufficient, but they have a compulsory force that compels us to reject the returns from this township as being so tainted with fraud, and so festered with corruption, that no reliance can be placed upon them as a matter of evidence. In Logan township twenty-two votes in favor of Cimarron are to be rejected and not counted, as having been procured by fraud, bribery, and corruption.

7. Township election returns, when wholly ignored.

IV. To counteract the effect of the frauds in Cimarron, and as a set-off to the villainy of the practices indulged in by the Cimarron board of election, assisted by the great mass of the adherents of the town, it is claimed by them that the friends of Ingalls bribed many of the voters of that township by the payment of money to vote for Ingalls. We have no doubt but that this charge is true. It is fairly demonstrated by the evidence contained in this record, that Gilbert and other agents of the owner or owners of the town of Ingalls were actively engaged all day long during the election in the town of Cimarron in buying and attempting to buy residents of that town to vote against their own interests, and suppress their natural preferences, and vote for the town of Ingalls for a small moneyed consideration. These practices were not confined to the day of election, but for some time before they had, by a purchase of property at extravagant prices, and by other corrupt means, secured quite a number of friends in the town of Cimarron. There is abundant evidence in this record to justify the conclusion that the friends of Ingalls were guilty of the most gross and aggravated bribery of voters on that day; that they kept an open market-house, hedged about and protected by a gang of reputed cut-throats and villains, where men's votes were bought and sold as so many steers in the pasture or sheep in the pen. All this is true, and it affords another and a very important reason why the returns from this township will not be considered. It seems as if all

the demons that infest the extreme western part of the state
had met at Cimarron on that day and vied with one another
in efforts to disregard the laws for the protection of the ballot-
boxes, and engaged in a rivalry as to who could best intimi-
date and bribe voters.    We shall not attempt to discriminate
between the action of these accomplished villains of all classes.
The history of such an election is an everlasting infamy.  All
we can do is to say that the returns of this indelible fraud
shall not enter into the consideration and determination of the
questions involved in this case.    We have no doubt of the
truth of the assertion that the bribery of voters by the active
agents of Ingalls was not confined to the township of Cimar-
ron, but that it extended to and embraced most of the town-
ships in the county.    The direct proof of such bribery and
corruption does not establish a sufficient number corrupted to
change the result, and in no instance does it in any manner
cast the shadow of suspicion on the election boards in Ingalls,
Hess, Logan, and Montezuma townships.    The election boards
in Cimarron and Foote townships monopolized all the fraud
that has been traced to the officers of that election.    This case
can fairly be said to embody the sum of all election villainy.
If there is any one particular crime connected with the con-
duct and the result of an election that was not committed in
Gray county on the 31st day of October, A. D. 1887, our re-
search has been in vain, for we have failed to find it.

V.  While there is some evidence in this record tending
to show that the voters in two townships were to some extent
influenced to cast their votes for Ingalls for the county seat
by a promise to construct and operate a railroad through these
townships, it fails to establish the names and residences of the
men that were so influenced, and to show how they voted.
The returns from these townships have not been attacked, ex-
cept in this general way.    There is not, in fact, enough of a
showing to require us to pass upon the specific question as to
whether the promise to build this railroad was bribery, or not.
A speech at a public meeting, and a resolution adopted by a
vote of those who attended it, are not enough to provoke the

inquiry.   If it had appeared that on the strength of a prom-
ise to build a railroad through these townships the great mass
of the voters therein were solely influenced to vote for a cer-
tain town for county seat, and that they did so vote, and if
it had not been for that promise they would have voted for
the opposing town, and all these facts were established by the
evidence of the voters, and not from hearsay, a very interest-
ing question would be presented.   But as the facts in evidence
do not necessarily compel us to pass upon it, we shall not at-
tempt to do so.   It probably would make no practical differ-
ence in the ultimate determination of this question anyhow.
We have determined to reject the returns from Cimarron and
Foote townships, and twenty-two votes from Logan, and this
leaves but one hundred and twenty for Cimarron; while with
Montezuma and Hess rejected, because improperly influenced
by the promise of the railroad, there would still remain a ma-
jority of the legal  vote in favor of Ingalls as the permanent
county seat.   If we give the relator the benefit of the most
favorable view that possibly arises on the state of facts pre-
sented, the result is that the majority of the honest vote was in
favor of the town of Ingalls.

VI. The prevailing practice in these county-seat contests is
for each party to import into the county a crowd of men who
have the reputation of being "killers."   It may be in some
cases they do not vote, but we suspect that generally they do.
The evident purpose of such an importation is to intimidate
voters, and to have on hand and ready for any emergency
that may arise, a class of men who would not hesitate to com-
mit any crime, or number of crimes, which would give suc-
cess to the party that pays them.   The importation of such
men causes a very strong presumption that they are employed
for purposes connected with these elections that all ordinary
men would hesitate to perform.   Their employment is a re-
flection on the courage and honesty of the community which
suffers such an outrage to be perpetrated, and causes their own
acts to be regarded with some degree of suspicion.   Their
presence in a county cursed with a county-seat contest is a

constant menace to the lives of many quiet and innocent people. One of the best indications that people desire an honest and peaceable election is their refusal to employ a horde of these conscienceless scoundrels; while on the other hand, their presence at the polls irresistibly leads to the conclusion that they are hired for criminal purposes.

Inasmuch as it is established by the evidence that the town of Ingalls received a majority of the honest votes for the permanent county seat of Gray county at the election held on the 31st day of October, 1887, it is recommended that the peremptory writ of *mandamus* be denied.

By the Court: It is so ordered.

VALENTINE and JOHNSTON, JJ., concurring.

HORTON, C. J.: As my brothers are satisfied with the foregoing opinion, and have concluded to follow the recommendation of the commission, it is unnecessary for me to discuss the evidence upon which the returns from Cimarron and Foote townships are rejected. Assuming all the charges against these returns to be clearly established, there are other facts disclosed in the testimony, which, in my opinion, have not received sufficient consideration. In the opinion of the commission it is stated:

"It is fairly demonstrated by the evidence contained in this record that Gilbert and other agents of the owner or owners of the town of Ingalls were actively engaged all day long during the election in the town of Cimarron, in buying and attempting to buy residents of that town to vote against their own interests, and suppress their natural preferences, and vote for the town of Ingalls for a small moneyed consideration. These practices were not confined to the day of election, but for some time before they had, by a purchase of property at extravagant prices, and by other corrupt means, secured quite a number of friends in the town of Cimarron. There is abundant evidence in this record to justify the conclusion that the friends of Ingalls were guilty of the most gross and aggravated bribery of voters on that day; that they kept an open market-house, hedged about and protected by a gang of reputed cut-throats and villains, where men's votes were bought and sold as so many steers in the pasture, or sheep in the pen."

Again, it is stated in the opinion that—

"We have no doubt of the truth of the assertion that the bribery of voters by active agents of Ingalls was not confined to the township of Cimarron, but that it extended to and embraced most of the townships in the county."

These conclusions are not only true, if the testimony is to be believed, but are a mild and faint statement only of the open, public, and notorious acts of bribery and corruption committed by the promoters, owners, and adherents of the town of Ingalls to secure the county seat. These persons seem to have been abundantly supplied with money with which to purchase votes, and were lavish in its use in carrying out a systematic and wholesale corruption of voters. While I have no reason to believe that the witnesses have traced all the money that was illegally and corruptly expended for the purchase of votes, sufficient is shown in the conduct and acts of the owners and adherents of Ingalls and the voters of Montezuma and Hess townships, if the voters of Cimarron and Foote townships are to be disfranchised because of the misconduct of their election officers, to make the whole election impure and invalid. Courts are established for the protection of innocence and justice, and not for the protection of supposed rights founded upon fraud and injustice; but, if the decision in this case is to be followed as to the other county officers, a county seat will be established upon an impure election, tainted with every species of fraud, bribery, and corruption, and completes the triumph of persons who, in this election, were guilty of flagrant violations of the laws of the state, of unblushing infamy, of notorious corruption and wrongs. The opinion confesses that—

"The acts of bribery of voters by the active agents of Ingalls extended to and embraced most of the townships of the county."

It is painful that in such a case as this the court cannot see its way clear to say that all of the wrongs disclosed by the testimony go to the validity of the election, and have the effect to make it absolutely void. It is said in the opinion, "That

rejecting the returns from Cimarron, Foote, Montezuma, and Hess townships, gives a majority for Ingalls." This, however, leaves only a few votes in Logan township and the 160 votes in Ingalls to be counted. This conclusion gives the adherents of Ingalls, who with others inaugurated the system of bribery and corruption which flooded Gray county at the county-seat election the 31st of October, 1887, the determination of the seat of justice. Is this fair, or in accordance with the usual proceedings of the courts? Is it justice that the adherents of a town guilty of the acts and outrages described in the opinion, be permitted to triumph in their selection of the county seat of a county which has 1,400 voters? Nearly one-half of the voters of the county lost their votes by the direct and indirect corruption of the adherents of the town alleged to be successful, and nearly all of the other half lost their votes by the misconduct of the election officers. In *The State v. Marston*, 6 Kas. 524 — a county-seat case — 4,552 votes were cast: one-half were illegal and fraudulent. This court refused, upon such an impure election, to establish the county seat. It was stated in that case:

" When two parties, who have both by their fraudulent and wrongful acts put vast obstacles in the way of justice, and incumbered the case with embarrassing difficulties, invoke the aid of courts, the courts will not feel very much inclined to assist either to a very great extent; and especially not in an action of *mandamus*, where so much rests in the discretion of the court. Courts will seldom, in such cases, weigh the claims of the parties in golden scales, and give a decision on a bare preponderance of evidence. The right of a party in such a case, if he expects a decision, should be clear beyond all reasonable doubt. Neither party in this action has made a clear case. Neither party has shown a clear right beyond a reasonable doubt, to the county seat of Neosho county; and neither party is in a condition to demand, as a matter of right, anything from this court; and therefore we shall leave the parties where we found them."

In *The State v. Stevens*, 23 Kas. 456 — a county-seat case — a large fraudulent vote was polled. This court refused an order to canvass, because it did not wish to give even an apparent sanction to such an outrage, so gross and so manifest.

If, however, it be said that the votes of Montezuma and Hess townships should be counted for Ingalls, and thereby permit a very small part of the votes of Gray county to decide the county seat, then I answer, the testimony shows that a very large per cent. of the votes received by Ingalls in these townships was transferred to that town by the promise of a large owner of Ingalls to build a railroad free of cost, east and west through and across these townships. James H. Kelly testified that this railroad scheme transferred from one-half to three-fourths of the votes of those townships. John A. Headley testified that seventy-five per cent. of the votes of Montezuma township were transferred to Ingalls in consideration of those propositions, and about sixty per cent. in Hess township. G. L. Ensign testified that the arrangement for the building of the railroad gave Ingalls, directly and indirectly, seventy to eighty-five per cent. of all the votes it got in the country. S. S. Van Wye testified that he preferred Cimarron, but the prospect of getting a railroad influenced his vote for Ingalls. He further testified that he thought the prospect of getting a railroad without bonds was the influence which made the vote in Montezuma township almost solid for Ingalls. In an address, published only ten days before the election, in a newspaper of Gray county, to induce the voters of Montezuma and Hess townships to support Ingalls for the county seat, the agreement with Mr. Soule concerning the railroad was referred to. I quote a short extract:

"We all remember how enthusiastically we told Mr. Soule in mass meeting assembled, that we were unanimous, first, last and always, for Ingalls for county seat, and offered this as an inducement, and urged him to build a railroad. And now if we should change and go back on this, and fail to be united, we would justly deserve to lose our road. Think a moment what we would lose! — railroad without bonding, our county seat at Ingalls without cost, no taxes for either, with all the benefit from having a millionaire spend his money in our county. Don't let us lose all this, but rather help ourselves while he is willing to help us. And people of middle and north Gray county will remember the compact and understanding that if Montezuma was not a candidate for county seat they would join hands and make Ingalls county seat."

The railroad route runs east and west through the southern part of the county, and does not increase the railroad advantages or facilities for Ingalls, nor in any way enhance the public convenience of that town as a county seat.    Therefore, the law as declared in the syllabus of *The State v. Elting*, 29 Kas. 397, does not apply.    While there is no question of moral character involved in the selection of a county seat, yet the questions of convenience and material advantages for the transaction of public business are, or ought to be, uppermost in the minds of the voters making the decision.    As the railroad was not for the benefit of Ingalls, and in no wise tended to increase its advantages for the transaction of business of any kind, a portion of the opinion of *The State v. Elting* is worthy to be reproduced, as it shows, under the facts disclosed by the testimony, that the railroad scheme was the inducement or bribery which tempted the voters of those townships.

In that case Mr. Justice BREWER said:

"A further question may arise when the offer of the candidate carries with it no pecuniary benefit to the voter; as, for instance, should a candidate for a county office offer to give, if elected, a portion of his salary for the erection of a public fountain; or, if a candidate for a state office, if elected, to endow a chair in some college: here it may be said that the voter is in no way influenced by considerations of personal gain. He receives no money in hand, his taxes will not be reduced, and he may in no manner be pecuniarily benefited by the donation.    This presents a case going still beyond those which have been decided, and yet very probably the same decision should control such a case, and for this reason: wrong considerations are thrown into the scale to influence the vote of the elector.    The theory of popular government is, that the most worthy should hold the offices.    Personal fitness — and in that is included moral character, intellectual ability, social standing, habits of life, and political convictions — is the single test which the law will recognize.    That which throws other considerations into the scale, and to that extent weakens the power of personal fitness, should not be tolerated.    It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot.    It is, in spirit at least, bribery, more insid-

ious, and therefore more dangerous, than the grosser form of directly offering money to the voter."

Therefore I may say that the proposition of a large owner and backer of Ingalls to the voters of Montezuma and Hess townships, which induced those voters to wholly disregard the conveniences, accommodations, and material or superior advantages of the places contesting for the county seat, in spirit at least, "was bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money" to the voters of those townships.

The buying of 71 votes with a bond of $10,000 is fittingly censured and denounced in the opinion; but is not the purchase of over 400 votes with a railroad scheme, or in default to pay as a forfeit $75,000, deserving of equal if not greater condemnation? If it is impossible to separate the good and bad votes in Cimarron and Foote townships, it is equally impossible to separate the good and bad votes in Montezuma and Hess townships. If the Cimarron and Foote votes are to be excluded, then I think there should also be excluded the votes of Montezuma and Hess.

Further, the scheme whereby Montezuma was taken out of the contesting towns for county seat was corrupt, and against public policy. To understand the full nature of the scheme it is necessary to state that the legislature formed Gray county in 1887. The town of Ingalls was formerly the post-office of Soule, named after A. T. Soule, a maker and seller of "bitters," of Rochester, New York. According to the evidence, he is a man of unlimited wealth. He was a large owner in Soule, and the builder of the railroad through Montezuma and Hess townships after the election. Soule was changed to the name of Ingalls, thereby adopting a very popular name in Kansas to attract attention and votes. The testimony shows that for temporary county seat the voters of Gray county expressed their choice as follows: For Ingalls, 88; for Montezuma, 560; for Cimarron, 705; for Stowe, 1; for center, 1; total, 1,355. At a meeting held in Montezuma prior to the election, at which the railroad scheme was fully considered,

discussed, and approved, the following resolution was unanimously adopted:

"*Resolved,* That we, the citizens of South Gray, unanimously resolve and do hereby withdraw Montezuma and every other possible town in South Gray county from the candidacy for permanent county seat in the coming election to be held for locating the same. And we hereby pledge ourselves individually and unitedly to use our best endeavors, our influences, and every honorable and lawful measure to locate the permanent county seat at Ingalls at the coming election."

By the promise to build the railroad free of cost east and west through. Montezuma and Hess, Montezuma was withdrawn as a candidate for county seat, and upon election day those two townships cast 431 votes for Ingalls and 77 only for Cimarron. If it were legitimate to buy off Montezuma, it was equally legitimate to buy off the other town contesting for the county seat, and in this way a county seat could be established by bribery and corruption, without regard to location, public conveniences, consequences, or results. In voting for Ingalls in Montezuma and Hess townships, the location for the county seat was practically lost sight of, and when the voters of those townships cast their ballots for the county seat, they were voting for a railroad to be built free of cost for their benefit, rather than deciding where the interests of the county demanded the location of the seat of justice. As was said in *The State v. Elting,* this was the result of "bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voters."

In 1871, the legislature of the state attempted to elect a United States senator. The election was subsequently investigated by the United States senate. It appeared upon the hearing that another person, who had been a candidate for the same office, through corrupt and improper influences withdrew his name from the canvass. Upon this showing the committee of the senate reported that the person holding the election certificate was not duly and legally elected to a seat in the United States senate. That report was based upon the following proposition:

"The buying-off opposing candidates, and in that way se-
curing the votes of all or the most of their friends, is in effect
buying the office.    It recognizes candidacy for office as a mer-
chantable commodity; a thing having a money value, and is
as destructive to purity and freedom of elections as the direct
bribery of members of the legislature." (U. S. Senate Rep.,
Nos. 233–456, 1872–3, pp. 2–6.)

Subsequently the person holding the certificate of election
accepted the result of the report and voluntarily resigned, and
retired from senatorial and political life.

Within the well-settled principle announced in the forego-
ing report of the United States senate, the proposition made
by one of the large owners of Ingalls to the voters of Mon-
tezuma and Hess townships, and acted upon by them, goes to
the validity of the county-seat election of Gray county, and
had the effect, if that principle be followed, to make the elec-
tion absolutely void.

If the election was void, then the county seat remains where
it was temporarily established by the governor, and the offi-
cers of the county should hold their offices there until the
people determined by a legal election where the permanent
county seat should be located.    This result would certainly
be in the interest of substantial justice, because, in the opinion
of the commission, it is stated:

"This case can fairly be said to embody the sum of all elec-
tion villainy.    If there is any one particular crime connected
with the conduct and the result of an election, that was not
committed in Gray county on the 31st day of October, 1887,
our research has been in vain, for we have failed to find it."

There are very many other matters in the testimony that I
would gladly refer to and comment upon, but the few hours
which I have had since the report of the commission was
presented, in which to formulate my views, prevent me from
more extended comment, which I deem the merits and im-
portance of the legal questions involved in the case deserve
and demand.