# INCORPORATED TOWN OF RYAN *et al.* v. TOWN OF WAURIKA *et al.*

No. 408.    Opinion Filed November 14, 1911.

(119 Pac. 220.)

1.    COUNTIES—County Seat Elections—Illegal Ballots—Counted as "Votes Cast." That part of the act of April 17, 1908 (section 12), providing that "every person desiring to vote at such special election, after having passed the challengers . . . and being ad-mitted into the room shall, before being given a ballot, permit

the clerks to fill out an affidavit and . . .˙shall subscribe and swear to said affidavit before said election commissioner, after which he shall be given a ticket . . . '' construed with an act approved May 29, 1908, S. B. 23, art. 7, sec. 5, Sess. Laws of Okla. 1907-8, is mandatory. And where the election inspector on the morning of the election placed said blank affidavits, part of the election supplies, in the hands of third persons who, with the knowledge of, and without objection from, the election officials, were permitted by each voter to fill out for and hand him one of said blank affidavits at a table 100 feet from the polls, as he passed thereby on his way to vote, and which, in the room, after passing the challengers and before being given a ticket, he signed and swore to before the special election commissioner, with knowledge of the contents, after which he was given a ticket and then and there voted—held that said ballot is illegal and cannot be counted for any town as a candidate for the county seat at such election, but may be counted for the purpose of determining the total number of votes cast at such election, and the required majority for the removal of the county seat.

2.  °  **SAME—Effect of Discrediting Returns—Burden of Proof.** Where the prima facie character of the returns of a precinct is destroyed, the election therein does not necessarily become a nullity, but the burden of proof then shifts and makes it necessary that the side claiming any benefit from the votes shall prove them. It is only where no proof is offered, and the frauds are of such a character that the correct vote cannot be determined that the returns of the precinct will be rejected.

(Syllabus by the Court.)

Original proceeding in injunction. Injunction made perpetual.

*W. A. Ledbetter, Gilbert & Bond*, and *Jones & Green*, for plaintiffs.

*Devereux & Hildreth, Bridges & Vertrees*, and *Robberts & Curran*, for defendants.

TURNER, C. J. The Constitutional Convention located the temporary county seat of Jefferson county at the town of Ryan. On June 30, 1908, an election was held in said county for the purpose of locating the county seat thereof pursuant to section 6, article 17, of the Constitution and an act approved April 17, 1908, Session Laws of Oklahoma 1907-8, pp. 378-387, in which said election there were three candidates—Ryan, Sugden, and Waurika. No one of these having received a majority of the

votes cast, and Sugden receiving the lowest number of votes, on September 9, 1908, a second election was had. The returns of that election show that Ryan received 1,500 votes and Waurika 1,736 votes, giving Waurika a majority of 236. These returns were certified to the Governor of the state, whose duty it is, under the Constitution, to canvass the same and declare the result and "cause the will of the electors to be carried into effect."

On September 21, 1908, plaintiffs filed in this court an original proceeding assailing the correctness of the returns at the Terral and Waurika precincts, on the ground of fraud and illegality, and to secure a restraining order against defendants, the county officers of Jefferson county, preventing them from removing, or attempting to remove, the records of their several offices from the town of Ryan to Waurika, alleging the fact to be that Ryan had received a majority of the votes cast in said election, and praying that it be declared the duly elected permanent county seat of that county. Later this court appointed Hon. C. A. Galbraith as referee, who took testimony and filed his report herein in favor of Waurika and recommended a dissolution of said injunction and that said town be declared the permanent county seat of said county.

Assailing the validity of the 686 votes cast at the Waurika box, it is contended by counsel for Ryan that the same should have been by the referee excluded from the count, for the reason the record discloses that the inspector, on the morning of the election and before the polls were open, turned over the blank affidavits provided by section 12 of the act aforesaid to a partisan of Waurika, who, with the assistance of others, filled one of them out for the voter and handed the same to him at a table without the roped chute some 100 feet from the voting booth, as he passed thereby on his way to the booth to vote. It is contended that by thus participating in a violation of the law, making it an offense for any person to have election supplies outside the enclosure wherein the election was required to be held (Act approved May 29, 1908, S. B. 23, art. 7, sec. 5, Sess. Laws 1907-8), the voter, besides being punishable for such par-

ticipation, in effect refused to permit the clerks of election to fill out for him said affidavit after he had passed the challengers and after being admitted into the room and before being given a ballot, and which, it is further contended, was a violation of said section, which, they say, in so far as the same requires that the voter, *"after having passed the challengers * * * and being admitted into the room, shall, before being given a ballot, permit the clerks to fill out an affidavit and * * * shall subscribe and swear to said affidavit before said special election commissioners, after which he shall be given a ticket * * *"* is mandatory, and hence none of the votes in that box should be counted. By making it an offense to have election supplies outside the enclosure, the law, in effect, prohibited their use by the voter outside thereof, and said to him by section 12, *supra*: "As to your ticket, you shall have no right to receive it for the purpose of voting until you have complied with certain conditions precedent, which are that you shall first pass the challengers, enter the room, and permit the clerk to fill out an affidavit, which you shall sign and swear to before the special election commissioner. Then, and not till then, are you entitled to a ticket and a right to vote."

Section 6, article 7, of the Constitution being self-executing, elections for the relocation or changing of county seats could have been held without this special act of April 17, 1908, *supra*. Obviously, the Legislature had a purpose, then, in enacting a special statute supplementary to said section of the Constitution. Courts are not at liberty to treat statutes as directory that were intended by the Legislature to be mandatory. The law is the master of the courts, and it is the duty of the judges to follow the mandates of the law.

What did the Legislature mean when it said that every voter desiring to vote at such special election, *after* having passed the challengers and being admitted into the room, shall, *before* being given a ballot, *permit* the clerks to fill out an affidavit *before* said special election commissioner—that *after* having passed the challengers and being admitted into the room, but *after*

the affidavit is filled out before said special election commissioners in said room, he shall be given a ticket? Why does the Legislature exercise such care in the selection and use of this language? It is presumed to mean just what it says. Every elector that voted had, as a matter of law, knowledge of this statute, and the only effect the court's action will have, in giving effect to this provision, is to cause another election. Such electors are not deprived of their right to participate in the final selection of a county seat; but, under these mandatory provisions, they are required to vote in the manner and form as therein pointed out, before their votes shall be counted. Where they make an honest effort to vote, but fail to comply with these mandatory provisions, such votes amount to votes cast, but not votes counted. The place or town finally prevailing must have counted for it a majority of the votes cast. The result is that, where no place gets a majority of the votes cast counted for it, another election is held, and such continues to be the procedure until a place gets a majority of the votes cast counted for it.

The wisdom of this special election law for the location of county seats was solely for the determination of the Legislature. The Legislature having acted, and having hedged around the holding of such elections such provisions, mandatory in their nature, and especially so in the light of the history of this legislation, we are not permitted to disregard the same, howsoever we may dislike to order a new election and entail the expense of the same upon this county.

That this section is mandatory, and certainly when construed with the section of the act, *supra*, is no longer an open question in this jurisdiction.

In *Incorporated Town of Westville v. Incorporated Town of Stilwell et al.*, 24 Okla. 892, 105 Pac. 664, we said:

"Is section 12 of said act, which provides that 'every person desiring to vote at such special election, after having passed the challengers, whose *duties* shall be the same as prescribed by law governing any general election, and being admitted to the room, shall, before being given a ballot, permit the clerks to fill out an affidavit and said intended voter shall subscribe and swear to

said affidavit before the said special election commissioner, after which he shall be given a ticket and permitted to prepare same and deliver said ballot to said special election commissioner, who shall, in the presence of said voter, deposit said ballot in the proper ballot box, and shall deposit the said affidavit in the box provided for that purpose,' mandatory?  *  *  *

"In the case of the *City of Pond Creek et al. v. Haskell, Governor, et al.,* 21 Okla. 711, 97 Pac. 338, it was held that section 6, art. 17, Const., providing for the holding of elections for the relocation or removal of the county seats of the different counties of the state, is self-executing, said section providing complete machinery for holding such elections, and that it was not necessary for the legislative enactments in order that the same might be enforced. The act of April 17, A. D. 1908, is therefore merely supplemental thereto. *State v. Scales,* 21 Okla. 683, 97 Pac. 584; *Reeves v. Anderson et al.,* 13 Wash. 17, 42 Pac. 625. What was the purpose, then, of the Legislature providing this supplemental legislation relative to county seat elections? Such location by the Constitutional Convention was temporary, self-enforcing machinery being provided for the relocation thereof by the respective counties, as is clearly evidenced by the fact that it is provided that after April 1; A. D. 1909, county seats, except where the petition. for the election was filed prior to October 1, 1908, should be removed only by two-thirds of the votes cast in the county at such election. Section 6, art. 17, Const. In addition to the requirements of the general election law (section 3, art. 5, c. 31, p. 341, Sess. Laws 1907-8), he must permit the clerks of the election to fill out an affidavit, and then he must subscribe and swear thereto.  *  *  *  The intention of the Legislature to impose the burdens, not only upon the election officers, but also upon the electors, of additional duties, is apparent. The affidavit in form gives the age, race, and number of years that the elector has been a resident of the county and state, and the ward or precinct in which he then resided, and the length of time that he resided there prior to the time of the holding of the election, including his prior place of residence. It seems to not only constitute a species of registration, but also to contemplate subjecting each elector to the danger of the pains and penalties of perjury if he is not a qualified voter.

"In the case of *Rampendahl v. Crump* (decided at this term, but not yet officially reported [24 Okla. 873] 105 Pac. 201) this court held: 'That part of section 4, c. 17, p. 234, Sess. Laws

Okla. T. 1905, which provides that on leaving the booth the voter shall "deliver the ballots to the inspector or judge temporarily acting as inspector, and such inspector shall forthwith, in the presence of the voter and members of the election board and the watchers, deposit same in the respective ballot boxes," is mandatory.' The following authorities were cited in support of that conclusion: *Attorney General v. May,* 99 Mich. 538, 58 N. W. 483, 25 L. R. A. 325; *Attorney General v. Stillson,* 108 Mich. 419, 66 N. W. 488; *Attorney General v. Kirby,* 120 Mich. 592, 79 N. W. 1009; *Vallier v. Brakke,* 7 S. D. 344, 64 N. W. 180; *State ex rel. Bradley et al. v. Gay,* 59 Minn. 6, 60 N. W. 676, 50 Am. St. Rep. 389; *Spurgin v. Thompson,* 37 Neb. 39, 55 N. W. 297; *Tebe v. Smith,* 108 Cal. 101, 41 Pac. 454, 29 L. R. A. 673, 49 Am. St. Rep. 68; *Lay v. Parsons,* 104 Cal. 661, 38 Pac. 447; *Kirk v. Rhoades,* 46 Cal. 398; *Taylor v. Bleakley,* 55 Kan. 1, 39 Pac. 1045, 29 L. R. A. 683, 49 Am. St. Rep. 233; *Curran v. Clayton,* 86 Me. 42, 29 Atl. 930; *Whittam v. Zahorik,* 91 Iowa, 23, 57 N. W. 57, 51 Am. St. Rep. 317; *Parvin v. Wimberg,* 130 Ind. 561, 30 N. E. 790, 15 L. R. A. 775, 30 Am. St. Rep. 254; *People ex rel. Nichols v. Board of County Canvassers,* 129 N. Y. 395, 29 N. E. 327, 14 L. R. A. 624. See, also, the following authorities: *Wright v. State Board of Canvassers,* 76 S. Car. 574, 57 S. E. 536; *Major v. Marker,* 99 Ky. 305, 35 S. W. 543; *Preston v. Prince,* 70 S. W. 623, 24 Ky. Law Rep. 1090; *Dill v. Surtleff,* 183 Ill. 440, 56 N. E. 164; *Patton v. Watkins,* 131 Ala. 387, 31 South. 93, 9 Am. St. Rep. 43; *Doeflinger v. Hillmantel,* 21 Wis. 574. * * * In this case there is neither any contention that any of the electors failing to swear to the affidavits were not otherwise qualified to vote at such election, nor that they did not make an honest though ineffectual effort to participate therein, so as to have their votes counted."

We are therefore of opinion that the act complained of was not only in violation of a mandatory, but probably also of a criminal, statute, and for that reason said 686 votes should not have been counted for either of the towns; but such of them as were cast in an honest but ineffectual effort to vote should be considered for the purposes of making up the total number of votes cast at that election. Are we correct in this conclusion that they should be considered as votes cast?

It would serve no good purpose to recite in detail the evidence adduced by counsel for Ryan in support of their al-

legations of fraud on the part of the election officials and the voters of the Waurika precinct. It is sufficient to say that Waurika, in mass meeting assembled, appointed an executive committee, one of whom served as judge of election at the Waurika box and testified that he had been a participant in at least twenty county seat fights; that said town raised $13,000 by popular subscription to be expended by said committee in the county seat campaign; that all evidence concerning its expenditures was purposely destroyed, or no account kept; that neither said executive committee nor any witness on the stand could or would tell how any considerable portion of said sum was expended; that partisans of Waurika, just prior to the election, caused a large number of negroes to be detained in the town for the purpose of voting them, said committee furnishing them free board and amusement; that three different gangs of transient railroaa laborers were brought from a distance and voted; that of the 115 men employed on a ditch in the town and voted it is impossible to tell how many of them voted legally, or how many were paid $2 by one of said committee, ostensibly for their day's work, but really for their vote; that all known voters thus paid were paid on written order given to each, only one of which was introduced in evidence, which was No. 203; that the challenger, watcher, and poll book holder were excluded from the polls by the election inspector contrary to law; that the voters were rushed through the voting booth in blocks of five and at an unusual rate of speed; that partisans of Waurika with large sums of money, a part of the popular subscription, with the knowledge and consent of the executive committee, visited other voting precincts in the county on election day and spent it in influencing votes for Waurika—was ample to sustain the finding of the referee that it was impossible to tell how much money was spent by Waurika, in furthering her candidacy for the county seat, for legitimate and how much for illegitimate purposes, and that the fraud disclosed was sufficient to destroy the value of the returns as evidence and justified the referee in so holding, in ef-

fect, and in setting the same aside and proceeding to purge the poll.

There is nothing in the contention of counsel for Ryan that when the referee found, in effect, that there was sufficient fraud to destroy the value of the returns as evidence, he should have thrown out the box. The rule is well stated in 10 Am. & Eng. Enc. of Law, 774, thus:

"The fraud does not invalidate the legal votes cast, but by destroying the presumption of the correctness of the returns, it makes it necessary that any person who claims any benefit from the vote shall prove them; and where no proof is offered, and the frauds are of such a character that the correct vote cannot be determined, the return of the precinct will be rejected."

Or, as stated by Judge McCrary in his work on Elections [3d. Ed.]:

"Sec. 534. Although the return of the vote of a given precinct, made in due form, and signed by the proper officers, is the best evidence as to the state of the vote, yet it may be impeached, on the ground of fraud or misconduct on the part of the officers of the election themselves, or on the part of others. In election cases, however, before a return can be set aside, there must be proof that the proceedings in the conduct of the election, or in the return of the vote, were so tainted with fraud that the truth cannot be deduced from the returns. The rule is thus stated in *Howard v. Cooper,* (1 Bartlett, p. 275): 'When the result in any precinct has been shown to be so tainted with fraud that the truth cannot be deducible therefrom, then it should never be permitted to form a part of the canvass. The precedents, as well as the evident requirements of truth, not only sanction, but call for, the rejection of the entire poll, when stamped with the characteristics here shown.'

"Sec. 535. The rule just stated needs the following explanation, in order that it may be correctly understood. The committee no doubt meant to say that if the result, as shown by the returns, is tainted with fraud, the returns are to be rejected as false and worthless. But as we have elsewhere seen, the question whether the entire vote of the precinct shall be rejected for fraud, depends upon another question, viz.: Whether from any evidence it is possible to ascertain the true result. The returns may be rejected as fraudulent, and yet the true vote may

be ascertained, and where it can be ascertained, independently of the rejected returns, the law requires that it be respected and enforced. Where the true vote cannot be ascertained whether from the returns or from evidence *aliunde,* the vote of the precinct is to be rejected."

In *State ex rel. v. Malo,* 42 Kan. 54, speaking of the rule to be applied when the *prima facie* character of the returns is destroyed, the court said:

"The legal effect, then, of the destruction or suppression of the poll books and tally sheets of the election held in Cimmaron township by the friends of that town, is not only to destroy the *prima facie* character of the returns, but to cast upon them the burden of proving, circumstantially and in detail, every vote cast at that election * * *. * * * in all cases it is very desirable that all honest ballots shall be counted, notwithstanding the fact that there may exist such a state of affairs as authorizes the court, acting in accordance with well-established rules, to reject the whole returns as untrustworthy and unreliable. In every case of this character there is still left a certain number of votes that are admitted to be honest, or that could be easily proven to be so if ordinary diligence is exercised; and no matter how grievous the wrong committed by the election board; and how actively the great body of the supporters of the town assisted in the perpetration of the fraud, still the disposition is, and should be, to count every honest ballot that can be established as such."

In *Londoner v. People,* 15 Colo. 557, the court in the syllabus said:

"Upon the rejection of the returns from an election precinct, the election therein does not necessarily become an absolute nullity; the burden of proof then shifts upon respondent to establish by evidence *aliunde* that a sufficient number of legal ballots were cast for him to secure his success."

See, also: *State ex rel. v. Fulton,* 42 Kan. 164; *Lloyd v. Sullivan,* 9 Mont. 577; *In re Wheelock,* 82 Pa. St. 299; McCrary on Elections [3d Ed.] sec. 535.

In *Rhodes v. Driver,* 69 Ark. 501, the court says:

"The election returns of Fletcher township being thus discredited, in the absence of any proof showing how each and every qualified elector voted, it is impossible to purge the ballot of

that township here. The contestees, if they depend upon the vote of that township, would have to show by proof other than the returns themselves, as to how the votes were cast."

Applying this well-established rule, and the further rule that where the returns are successfully impeached for fraud, they are wholly unworthy of credit, and are evidence of nothing except that a poll was opened (*Board of Supervisors of Knox County et al. v. George Davis et al.*, 63 Ill. 405), the referee, without objection, and we think correctly, sent for the Waurika box and ordered it opened, and its contents were introduced in evidence. During the purging an agreed list of 279 qualified voters was carved out of the box. Of these, the record discloses 12 not on the poll books and 13 voting for Ryan, leaving the residue 254 votes for Waurika. Of a further list of 56 voters ordered purged by the court, six are not on the poll books, two voted for Ryan, and 37 for Waurika, leaving 11 unpurged in the box. Assuming the burden of proof, Waurika sought to qualify a list of 264 votes; of these, 19 were not on the poll books, 17 were disqualified, two on the agreed list, and four voted for Ryan, leaving the residue, 222 qualified votes for Waurika. This leaves, instead of 661 votes for Waurika and 19 for Ryan, as shown by the official returns, 513 for Waurika and 19 for Ryan out of this box; leaving unpurged in the box 137 ballots after deducting the 17 disqualified voters—leaving also 549 voters who made honest but ineffectual efforts to vote and whose ballots should and will be counted in making up the total number of votes cast at this election.

In view that we have held that of said 686 votes only 549 should be counted, and that only for the purpose of determining the total number of votes cast, it would serve no good purpose to answer the contention of counsel for Ryan that the 513 votes thus found for Waurika should be still further reduced because, they say, in that box there were voted 89 ballots which were written with pen and ink.

A purge of the Terral box, ordered by the court on proper showing, subsequent to the first report of the referee, disclosed,

Incorporated Town of Ryan et al. v. Town of Waurika et al.

and the referee found in effect, that of the 160 votes cast at that precinct, 38 were for Ryan and 80 for Waurika, leaving 42 unpurged in the box. Said report is affirmed. Hence we have:

Cast in county outside of Terral and Waurika precincts:

|  | For Ryan | 1,423 | For Waurika | 967 |
|---|---|---|---|---|
| At Terral precinct | " " | 38 | " " | 80 |
| At Waurika " | " " | -- | " " | -- |
| Total | " " | 1,461 | " " | 1,047 |

—making the total votes cast 2,508, plus the 549 votes cast at the Waurika precinct but not counted for either town, or 3,057 votes—of which neither candidate received a majority.

As the counting as votes cast the 137 unpurged votes in the Waurika box and the 42 in the Terral box would not change the result, we will not determine whether the same should be so counted. It follows that, as neither town received the requisite portion of. all the votes cast, another election should be called, pursuant to the prayer of the petition already filed and upon which this election was called, pursuant to sec. 6, art. 17, of the Constitution, at which election only these two towns are entitled to be candidates, and the town receiving the majority of votes cast at such election shall be the county seat of Jefferson county.

The injunction granted herein is sustained and made perpetual.

WILLIAMS, J., and AMES, J., concur; DUNN, J., concurs in the result; KANE, J., dissents.

NOTE: Justice Hayes being disqualified, Hon. C. B. Ames was appointed to sit in his place.