CITY OF TECUMSEH *et al.* v. CITY OF SHAWNEE *et al.*

No. 697. Opinion Filed May 14, 1912.

Rehearing Denied September 10, 1912.

(126 Pac. 440.)

1. **COUNTIES—County Seat Elections—Bribery.** An offer of the mayor and city council of a city that is a candidate for designation as a permanent county seat at an election for that purpose to lease to the county for courthouse and jail purposes for a period of ten years the city's city hall at a rental of $10 per year, when the rental value of said property is $3,000 per year, which is made to induce voters to vote for said city at the election, constitutes, by reason of section 7, art. 17, of the Constitution, bribery.

2. **SAME—Effect on Election.** Where the municipal authorities of a city which is a candidate at a county seat election for the selec-

tion of a permanent county seat of a county, for the purpose of influencing votes in favor of said city, offer the use of its city hall to the county for courthouse and jail purposes for a period of ten years for $100, when the rental value thereof for said period of time is $30,000, and such offer is circulated throughout the county by the supporters of said city by circulars, handbills, and newspapers; and a large number of the voters in different parts of the county become interested therein and visit the city at their own expense, or at the expense of its supporters, and inspected the building; and it is shown that said proposition was urged throughout the campaign prominently as a reason why said city should be selected as the county seat; and where the supporters of said city by voluntary subscription raised a fund of more than $20,000, no record of the expenditure of which was kept; and it was intentionally handled by the disbursers thereof in such a manner that to whom it was expended and for what purposes expended could not be ascertained from any record; and it could not be determined what part of it was spent legitimately and what part illegitimately; and it is shown that a large number of voters to wit, 61 in number, in different parts of the county, were bribed with part of said money to vote for said city, and that some of the election officers participated in said fund; and it is impracticable, if not impossible, on account of the way in which said money was handled, to determine the extent of its corrupt influence upon the electorate of the county; and where, by reason of the foregoing fraud and corruption, the result of the election is inextricably in doubt, and the will of the uncorrupted voters of the county cannot be ascertained from the returns of the election—said returns should be held for naught, and the burden held to be upon said city claiming to have been selected at such election as the permanent county seat to show such fact by evidence aliunde the returns.

(Syllabus by the Court.)

Original action by the City of Tecumseh and others against the City of Shawnee and others to contest a county seat election. Report of referee in favor of contestants affirmed.

*Robert Wheeler, G. A. Outcelt, McClain Taylor, Dale, Bierer & Hegler, Claude Weaver,* and *W. A. Ledbetter,* for plaintiffs.

*B. B. Blakeney* and *J. H. Woods,* for defendants.

HAYES, J.   This action is an original action brought in this court by plaintiffs to contest a county seat election.   After issues were joined the cause was referred to a referee to report his findings of fact and conclusions of law, which he has done, and the cause is now before us upon exceptions to the report of the referee.   The general recommendation of the referee

is that a judgment be rendered annulling the returns of the election contested.

Numerous specific findings of fact are made in the report. We shall, however, except where we deem it important to quote the language of the report, state the facts substantially as found therein. The city of Tecumseh, one of the plaintiffs, was by the Constitution designated the county seat of Pottawatomie county. Article 17, sec. 8kz, Constitution. On the 10th day of February, 1909, there was held in that county an election to determine the permanent location of the county seat therein. At that election the candidates were the city of Tecumseh and the city of Shawnee; the latter being one of the defendants in this action. As shown by a certificate of the Secretary of State, as authorized by section 6, art. 17, of the Constitution, the city of Tecumseh is about two and one-half miles from the geographical center of Pottawatomie county, and the city of Shawnee is more than six miles therefrom. By reason of these facts, in order to locate the permanent county seat at the city of Shawnee, it was necessary that that city obtain 60 per centum of the total votes cast at the election. Section 6, art. 17, Const. By the returns of said election it is shown that the city of Tecumseh received 3,026 votes cast at said election, and that the city of Shawnee received 4,948 votes, and that there were twenty mutilated ballots cast and not counted for either of the candidates.

No question is raised at this time upon the pleadings, and it is unnecessary to state here their contents, further than that the grounds of contest relied upon are bribery and irregularities in the conducting of the election in certain precincts of the county.

On the 15th day of December, 1908, the mayor and city council at a regular meeting made by resolution the following proposition to the county:

"Be it resolved by the mayor and councilmen of the city of Shawnee: That in the event the county of Pottawatomie, state of Oklahoma, shall within twelve months from this date desire to lease from said city of Shawnee the city hall of said city, for the purpose of courtrooms and county offices and jail, that the mayor and city councilmen will lease the same to Potta-

watomie county for the period of ten years at an annual rental of ten dollars per year."

Thereafter, on the 21st day of January, 1909, a bond was executed by 96 citizens of the city of Shawnee, including, among the number, many of the most prominent and financially responsible residents of the city. This bond, after setting out the foregoing resolution of the city councilmen and mayor of Shawnee, is conditioned as follows:

"That we, the undersigned, are held and firmly bound unto the county of Pottawatomie, in the state of Oklahoma, in the sum of twenty-five thousand ($25,000) dollars, well and truly to be paid, and for the payment of which we hereby bind ourselves, our heirs, executors, administrators and successors jointly and severally by these presents. Dated this 21st day of January, 1909. The conditions of this obligation are such that: Whereas, the city of Shawnee by and through its mayor and councilmen has submitted the above proposition to Pottawatomie county in writing, which proposition as above set out is made a part of this bond. Now, therefore, if the said city of Shawnee shall well and truly comply with each and every condition of said proposition for the period of ten years, this obligation becomes null and void, otherwise to remain in full force and effect."

The foregoing resolution and bond were thereafter submitted to the board of county commissioners, who passed a resolution rejecting the same.

The tenth finding of fact is as follows:

"That after the passage of this resolution of the mayor and councilmen of the city of Shawnee, and the execution of the undertaking and the action of the board of county commissioners, rejecting these offers on the part of the county, the city of Shawnee, through its chamber of commerce and campaign committee, acting in behalf of said city as a candidate for the county seat, sent its representatives and agents into all parts of said county, for the purpose of inducing the voters to visit the city of Shawnee, and procured large numbers of them to make such visit, and exhibited the building described in their resolution generally to the voters of the county making such visit, and actively circulated and published, by handbills and newspaper publications, throughout the entire county, the offer contained in such resolution, and arguments setting forth the

advantages that might be derived by the county from an acceptance of this offer."

In his eleventh finding of fact the referee finds that the city of Tecumseh also sent representatives and agents generally throughout the county and gave general circulation of the resolution of the board of county commissioners rejecting the offer of the city of Shawnee.

The twelfth finding of fact is as follows:

"The resolution adopted as aforesaid by the mayor and council of the city of Shawnee, and the undertaking executed by a large number of its citizens, hereinbefore set out, were put forth, made and published on the part of the representatives of the city of Shawnee, in the campaign, for the purpose of influencing the voters of the county in this election."

By the thirteenth finding, it is found that the circulation made by the city of Tecumseh of the resolution of the board of county commissioners was for the purpose of counteracting the influence of the resolution and bond made and circulated by the city of Shawnee, and as an argument to influence voters in favor of Tecumseh.

The fourteenth finding is as follows:

"The publication and circulation of the Shawnee resolution and undertaking were so general and energetic throughout the campaign on the part of the adherents of Shawnee that, in my judgment, they did exercise an influence throughout the county in favor of Shawnee upon a portion of the electorate, the exact number and the extent of which is not disclosed in the evidence, and it would be impossible for me, upon the record before me, to determine."

The referee also finds upon the evidence before him that fifteen voters, whose names he sets out in the report, were influenced to vote for Shawnee by reason of that city's offer of its city hall to the county for courthouse purposes.

By the twenty-third finding he also finds that at the beginning of the campaign there was subscribed and contributed by the supporters of the city of Shawnee a campaign fund of more than $20,000; that this fund was put into the hands of campaign directors and workers principally in currency; that "it was understood between the campaign committee, workers, and con-

tributors of the fund that no record should be kept of the amount of funds contributed, no vouchers taken for items disbursed, and no account made by the persons in whose hands the money was intrusted to any one. It was the purpose and intention of the persons who were actively in charge of the campaign in behalf of Shawnee to so handle the use of this fund that it would be impossible or impracticable to trace or determine either its source or ultimate use."

He further finds that, because of the manner in which the fund was handled, no evidence was introduced or could be obtained as to how the same was disbursed, except the parol testimony of the persons actively engaged in the management of the fund.

He finds as to the disbursement of it as follows:

"From this character of evidence it appears that the fund was distributed lavishly and carelessly to a degree, to say the least, surprising. One hundred and nineteen (119) voters for Shawnee appear to have participated in this fund in amounts ranging from $800 to 50 cents. Negro voters at the village of Earlsboro, and also at McCloud, were paid freely from this fund, some before and some after they had voted. In these precincts and in several others the negro vote was large, and while the evidence does not show, and from the intrinsic nature of the transaction cannot show the precise extent to which this vote was influenced by money, my opinion is, from the whole evidence on this subject, that the negro vote was generally corrupted. Many negroes the day of the election, or shortly before it, were brought into the city of Shawnee from Seminole county by persons working for the interests of Shawnee to vote. Their transportation and expenses were paid by persons interested on behalf of Shawnee, but I cannot find from the proof whether any of these voted, or, if so, how many. Several of the persons who participated in the fund were in different capacities election officers; some of them were counters, some clerks, some judges and one a special election commissioner."

To the contention of the persons who disbursed this fund, and of some of those who received it, that it was designed merely to compensate persons who polled the different precincts and persons who furnished transportation and entertainment ,for

voters who were in favor of Shawnee, for their trouble and expense, the referee found:

"I cannot find a fund so large could reasonably be used for these innocent purposes, and I must find from the evidence that it was the intention of the supporters of Shawnee to influence the electorate corruptly by paying to supposed leaders considerable sums of money for their influence and support, and permitting smaller sums of money to be distributed among the voters themselves as a direct bribe. While I cannot find from the proof how far the influence of this corruption extended, or all the specific votes affected thereby, or the number thereof, it is certainly true that so large a fund handled in the way that it was did, to an important extent, debauch the electorate of the county, and destroy the purity and fairness of the election."

The referee, however, did find specifically from the evidence that 61 persons, whom he names in his report, were by the use of said money bribed to vote for the city of Shawnee. He also finds that five persons who were not qualified voters voted for Shawnee. Upon the foregoing facts, he finds as a conclusion of law that the fairness and integrity of the election had been so far destroyed that the result thereof is inextricably in doubt, and that the returns of the election cannot be relied upon to show the free, honest, and uncorrupted will of the people, and that the returns of the election should therefore be annulled, and he recommends that judgment of the court be accordingly.

There is but little exception taken by defendants to the findings of fact by the referee. It is first objected that the finding quoted above to the effect that it was understood between the campaign committee and contributors of the fund that no record should be kept of the amount of the fund contributed, no vouchers taken for items disbursed, or other record made of the expenditure of this money, is not supported by the evidence. Upon examination of the record, we are unable to find evidence to establish that the contributors to this fund had an understanding with the workers and the persons immediately in charge of disbursing the same that it should be handled in the manner found by the referee; but the evidence does clearly establish that there was an understanding between the active workers in behalf of Shawnee and those immediately in charge of this fund and the

disbursement thereof that no record should be kept of it, and that it should be so handled that there would be no written evidence as to whom or for what it was disbursed, and, thus modified, the finding should stand, and the error committed by the referee is of no material consequence, in so far as it affects the application of law to the facts in this case.

It is also objected that there is no evidence to support the finding of the referee that many negroes on the day of the election or shortly before were brought into the city of Shawnee from Seminole county to vote by persons working for the interest of the city of Shawnee. This finding, we think, is also unsupported in part by the evidence. There is evidence to the effect that negroes were brought into Shawnee, from Seminole county, but they were brought by a resident of Seminole county for the purpose of selling their votes to the supporters of Shawnee, and an effort in that direction was made, but without result; and it is not shown that the person bringing said negroes into Shawnee was employed by Shawnee or its supporters or interested in the matter in any other way than in the profits he thought he would derive from a sale of the votes. The evidence does not disclose that any of these negroes voted, and the referee's report should be modified also to this extent. But, as thus modified, we think that the facts found by the referee are sufficient to authorize and justify the recommendation for judgment made by him.

It is not shown that the twenty mutilated ballots cast were not cast by qualified voters, or that the voters casting same did not make an honest but an ineffectual effort to cast a fair and intelligible ballot in accordance with the requirements of the law. Said ballots, therefore, should be considered in determining the total number of votes cast at the election. *Town of Eufaula v. Gibson et al.,* 22 Okla. 507, 98 Pac. 565. Including the mutilated ballots, it is shown by the returns of the election that 7,994 votes were cast, from which should be deducted the five votes cast by persons not legally qualified to vote, leaving a total of 7,989 votes cast at the election. Of this number it was necessary for the city of Shawnee to secure 4,794 in order

to be chosen the permanent county seat. Deducting from the number of votes shown by the returns of the election to have been cast for Shawnee the five votes cast by persons not qualified to vote; the sixty-one votes cast by persons found to have been bribed for a money consideration, and the fifteen votes cast by persons who were influenced by the proposition of the city of Shawnee to furnish its city hall for courthouse purposes, leaves a total vote for Shawnee of 4,867, or 73 votes in excess of 60 per cent. of the total votes cast; and it is contended by defendants that upon these facts the returns of the election should not be annulled, but that it should be decreed that the conclusion of law and the recommendations of the referee be set aside, and that Shawnee was selected as the permanent county seat. It is our opinion that this contention should not be sustained.

It is first urged by defendants that the offer of the city authorities of Shawnee to furnish the city hall for courthouse and jail purposes for a period of ten years for a nominal rent is not bribery. This question, we think, is concluded against defendants by a decision of this court in *Town of Grove v. Haskell et al.,* 24 Okla. 707, 104 Pac. 56. Section 7, art. 17, of the Constitution, provides as follows:

"Any person or corporation offering money or other thing of value, either directly or indirectly, for the purpose of influencing any voter for or against any competing town in such election, shall be deemed guilty of bribery."

This section has reference to towns competing in elections for the location of permanent county seats, and the same language was enacted into a statute at the first session of the Legislature. Comp. Laws 1909, sec. 885. In *Town of Grove v. Haskell, supra,* it was held that an offer by the supporters of a place that was a candidate in a county seat election to furnish to the county without expense to it a tract of land on which to build a courthouse and jail, and that they would build or cause to be built a courthouse, without expense to the county, and would rent the same to the county for less than the present courthouse and jail, constituted bribery, and that votes obtained by reason thereof were illegal and void, and should not be counted. The city hall in

the instant case is found by the referee to be of the value of $30,000 and to have a rental value of $3,000 per year. . Under the offer of the city authorities of Shawnee the use of this property was to be given to the county for a period of ten years for $100; or, in other words, these authorities were offering as an inducement to secure votes to locate the county seat at Shawnee rents in the sum of $29,900. It is true that this offer was made to no certain person or persons, but was offered as a gift to the county from which the entire taxpaying public would receive a benefit, in the event of the selection of the city of Shawnee as the county seat, because the right to use this building would render it unnecessary to rent or build a courthouse and jail at the expense of the taxpayers. That such offers are not, under the statutes of most states, held to constitute bribery or to contravene their public policy, is recognized in *Town of Grove v. Haskell et al., supra.* But it was said in that case:

"By this provision (referring to the foregoing constitutional provision) it will be noted that Oklahoma has specifically declared to be bribery the doing of the things which, in the absence of such statute or constitutional provision, the other states referred to have held did not under their laws constitute bribery."

It is contended by defendants that nothing of value was offered by the authorities of Shawnee, and that, if there was, such act of the authorities of the city of Shawnee could not constitute bribery, because the same was *ultra vires* and void, and that this fact must have been apparent to the voters upon the face of the offer. We do not think, in view of the construction heretofore given to the constitutional provision and statute applicable to this question by this court, which we now see no reason to depart from, that this contention should be sustained. Assuming the acts of the mayor and city council to be *ultra vires,* it still does not result that nothing of value was offered, or that the voters who were influenced by the offer to vote for Shawnee would not receive the benefit of the offer. The voters may have believed that the want of power in the city authorities to make the contract would never be contested by any one. The offer had the moral support of the citizens of Shawnee. Many of its most

prominent and responsible citizens executed a bond that the offer of the city would be carried out. The referee finds, and there is an abundance of testimony to support his finding, that this offer did influence voters to vote for Shawnee, and that such influence was so extensive and general throughout the county that it is impracticable, if not impossible, to ascertain the extent thereof. That which the authorities of the city offered, to wit, the use for a period of ten years of the city hall, was a thing of value. If an offer of something of value to influence voters is to be declared not bribery because it cannot be enforced against the person offering same, then this statute and every other statute defining a mere offer to give something of value to be bribery would be rendered nugatory, for every offer to bribe is void and unenforceable.

In *Bush v. Head,* 154 Cal. 277, 97 Pac. 512, the successful candidate at an election, in order to induce persons to vote for him, had promised that, if elected to the office, he would not qualify or accept said office, and that thereby the office would be left without an incumbent, and that the county would be saved the expense of the salary of such officer. On a contest by the losing candidate it was held by the court that such an offer constituted bribery under a statute which made it unlawful for any person directly or indirectly to contribute any money or other valuable consideration to or for any voter, or to or for any person, to induce such voter to vote or refrain from voting at an election, or to induce any voter to refrain from voting for any particular person, and it was held that, although such vacancy could be filled by appointment, such offer having been made to the voters and acted upon by them in that they were induced to vote for the candidate making the offer, it constituted a violation of the statute, and invalidated the election. See, also, *State v. Malo,* 42 Kan. 54, 22 Pac. 349.

The offer of the authorities of the city of Shawnee was extensively circulated throughout the entire county, and brought generally to the knowledge of the voters. That such offer would confer upon the taxpaying public of that county a pecuniary advantage was the belief of some of the voters and acted upon

by them is established by the evidence.  To hold now that such offer does not constitute a violation of the constitutional provision and statute would be to give these provisions a too narrow and technical construction.  It was the purpose of the lawmakers to secure the selection of the permanent county seats of the counties of the state to be made solely upon the merit or the suitableness of the candidates therefor, without reference to any temporary advantages that might be offered in the way of bonuses, given by the candidates or the supporters thereof.  By offering large sums to the public in the way of courthouses or the payment of other expenses ordinarily borne by the county, a town, far less suitable as a location for a permanent county seat, less accessible to the public who must transact business thereat, might secure its selection solely by the temporary advantages offered to the present generation of taxpayers, and thereby impose upon the future generation of taxpayers and residents of the county who must transact business at the county seat the burdens of an unwise selection when considered without reference to the temporary advantages.

In *Town of Grove v. Haskell, supra,* it was held that votes obtained by offers made in violation of this provision are void, and should be excluded.  The question in that case arose upon an allegation of plaintiff's petition that the unlawful offers made in that case induced 100 persons or more to vote for the candidate in whose behalf the offers were made; and it was determined by this court that such allegation stated a cause of action.  The majority received by the prevailing party in the election involved in that case was 98 votes.  Upon the authority of that case, it is insisted by defendants that the unlawful offer made in the present case should operate only to exclude the votes shown by plaintiff to have been influenced thereby, and not to annul the returns of the election.  The facts of this case present a question not presented in the Grove case.  While the referee has been able to find from the evidence certain persons, fifteen in number, were influenced to vote for Shawnee solely by this unlawful offer, he also finds that this does not represent the entire result of this corrupt influence upon the

electorate of the county, and that from the very nature of this influence the exact extent thereof is impracticable or impossible to ascertain from the evidence before him, but that it is such as to render the result of the election inextricably in doubt, and that the returns of the election cannot be relied upon to show the free and uncorrupted expression of the voters. It is shown that advantages of the unlawful offer were emphasized by the supporters of the city of Shawnee throughout the campaign preceding the election, and that the public became interested therein, for a large number of people voluntarily, some of them at their own expense and others at the expense of the supporters of Shawnee, visited the city of Shawnee and investigated the offer that had been made. Bribery at all times is an offense difficult to establish because it is a character of violation of the law which may be consummated without being observed by any one except the participants in the crime; but, as defined by most statutes, there are always at least two persons who witness the commission or have knowledge of any act of bribery, to wit, the offerer of the bribe and the acceptor. But the violator of the law here involved may reap the benefits of his unlawful act without even being brought into contact with the acceptor of his offer. He may publish his offer broadcast, circulate it freely among the electors, as was done in the case at bar, and the voter induced thereby cast his vote in favor of the candidate for which the offer is made without danger of anyone's knowing it, except the voter so influenced. From the very nature of the transaction, proof of the acceptance and the extent of the influence of such an offer is impracticable, if not impossible; for the only direct evidence by which it can be established must come from the person who acted upon the unlawful offer and who feels and is secure from discovery, and, except in rare instances, would therefore be slow to confess himself party to such offense, because he knows that he alone possesses knowledge of the fact sought to be established.

It is true that the board of county commissioners, some time prior to the election, by resolution rejected the offer of Shawnee, but the offer was not withdrawn; nor did the rejection

of it by the board of county commissioners before the election foreclose the county from receiving its benefits, for it could be acted upon after the election, and the evidence establishes since the election Shawnee has shown itself ready and willing to carry out its offer, and renewed its proposition to make the lease proposed before the election. Added to the foregoing fraudulent acts of Shawnee and its supporters is the further important fact that among its residents there was raised by popular subscription more than $20,000, which was expended by a committee in such manner as to effectually conceal the way and for what purposes it was spent. That some of it was spent for unlawful purposes is established by the finding of the referee of the direct purchase of 61 votes; and there is evidence in the record tending strongly to show that other voters were influenced corruptly by the expenditure of this money. Some of the officers who assisted in holding this election participated in this fund. That some of it was legitimately spent the evidence establishes. That some of it was illegitimately spent is equally well established. What part was spent legitimately and what part illegitimately cannot be ascertained from any record of the transactions of those charged with disbursing this fund, for no record thereof was kept. Discussing a very similar state of facts and the effect thereof upon the returns of the election, this court, in *Incorporated Town of Ryan v. Town of Waurika*, 29 Okla. 655, 119 Pac. 220, said:

"It is sufficient to say that proof that Waurika in mass meeting assembled appointed an executive committee, one of whom served as judge of election at the Waurika box, and testified that he had been a participant in at least twenty county seat fights; that said town raised $13,000 by popular subscription to be expended by said committee in the county seat campaign; that all evidence concerning its expenditure was purposely destroyed, or no account kept; that said executive committee and no witness on the stand could or would tell how any considerable portion of said sum was expended; that partisans of Waurika just prior to the election caused a large number of negroes to be detained in the town for the purpose of voting them, said committee furnishing them free board and amusement; that three different gangs of transient railroad laborers

were brought from a distance and voted; that of the 115 men employed on a ditch in the town and voted it is impossible to tell how many of them voted legally, or how many were paid $2 by one of said committee, ostensibly for their day's work, but really for their vote; that all known voters thus paid were paid on written order given to each, only one of which was introduced in evidence and was No. 203; that the challenger, watcher, and poll book holder were excluded from the polls by the inspector contrary to law; that the voters were rushed through the voting booth in blocks of five, and at an unusual rate of speed; that partisans of Waurika with large sums of money, a part of the popular subscription, with the knowledge and consent of the executive committee, visited other voting precincts in the county on election day, and spent it in influencing votes for Waurika—was ample to sustain the finding of the referee that it was impossible to tell how much money was spent by Waurika in furthering her candidacy for the county seat for legitimate and how much for illegitimate purposes, and that the fraud disclosed was sufficient to destroy the value of the return as evidence, and justified the referee in so holding in effect, and in setting the same aside and proceeding to purge the poll."

Authorities cited to support the conclusion there reached are equally applicable to the case at bar. In this case, in addition to the use of a large amount of money generally throughout the county to purchase and influence votes as was done in the Ryan case, there is the unlawful act committed by the authorities of Shawnee in offering the use of its valuable property for a nominal sum to the county for a long period of time, and we think the referee correctly found that sufficient fraud has been shown to destroy the value of the returns as evidence to show the choice of the uncorrupted electors of the county, and that the burden was shifted to the defendants to show by evidence *aliunde* the returns, if it can be done, that it received the necessary per cent. of the honest, uncorrupted votes cast to select it as the county seat. This it did not undertake to do; and, for these reasons, it follows that it should be declared that no choice was made by the election.

Since it is not shown that either city received the requisite portion of all the votes cast to select it as the permanent county seat of the county, under the rule announced by this court in

*Incorporated Town of Ryan v. Incorporated Town of Waurika et al., supra,* and *Incorporated Town of Westville v. Incorporated Town of Stilwell et al.,* 24 Okla. 892, 105 Pac. 664, another election should be called by the Governor, at which the city of Shawnee and the city of Tecumseh only are entitled to be candidates; and the candidate receiving at such election the percentage of the votes required by the Constitution to select it as the permanent county seat shall be the county seat of Pottawatomie county.

TURNER, C. J., and WILLIAMS, KANE, and DUNN, JJ., concur.