## INCORPORATED TOWN OF BRISTOW v. CITY OF SAPULPA.

No. 386.    Opinion Filed June 25, 1912.

Rehearing Denied September 10, 1912.

(126 Pac. 446.)

1.    **COUNTIES—County Seat—Election.** Section 6 of article 17 of the Constitution (paragraph 324, Williams' Ann. Const. Okla.) provides in reference to elections for the permanent location of county seats that, "if a majority of all the votes cast in the county at such county seat election shall be in favor of any town, such town shall thereafter be the county seat." In a contest over an election for the permanent location of a county seat, it was made to appear by the report of a referee that the partisans and supporters of one of the contestants by unlawful and corrupt practices so debauched the electorate of two precincts as to prevent a fair and impartial election, and that by reason thereof the same did not give a fair expression of the will of the people, and as a conclusion of law found that, because of these corrupt practices committed by the partisans and supporters of the said town, it was not entitled to have counted for it the votes it had received therein as shown by the said returns. Approved.

2.    **SAME.** It was further found by the referee as a result of the evidence adduced before him that but six votes cast at the said precincts out of a total of 508 were disqualified and illegal because of a lack of statutory qualifications to vote, and that this number shall not be counted as going to make up the total number of votes cast. Approved.

3.   **SAME.** It was further found and reported by the said referee as a conclusion of law that the balance of the votes in the said precincts should not be counted as votes cast because of the fraudulent conduct and illegal practices of the partisans of the said town, notwithstanding said votes were not shown to have been illegal, and also notwithstanding the result of such holding would be to award to the said town the fruits of the fraud committed by its supporters and establish it as the permanent county seat of the said county. Disapproved, because the citizens of a county are constitutionally entitled to have their county seat located by a majority of the legal votes cast, and no contestant for county seat honors will be permitted by unlawful practices and corruption to prevent a fair election and have rejected as illegal a sufficient number of votes, which would otherwise be counted as votes cast, where the same would result in making the votes received by the said town a majority of the balance of the votes cast and counted.

(Syllabus by the Court.)

Original action by the Incorporated Town of Bristow against the City of Sapulpa to contest a county seat election. Report of Charles H. Parker, referee, affirmed in part and reversed in part, and another election ordered.

*Hutchings & German* and *Du Mars & Vaught,* for plaintiff.

*McDougal, Lattimore & Lytle,* for defendant.

DUNN, J.   This case is an original action in this court brought for the purpose of contesting the result of an election called for the purpose of locating the permanent county seat of Creek county, Okla: The temporary county seat of the said county was fixed by the Constitutional Convention at the city of Sapulpa. On a petition duly filed an election was called and held under the provisions of the Constitution and an act of the First Session of the state Legislature (Sess. Laws 1907-1908, p. 378), on the 12th day of August, 1908. At this election Bristow offered as the sole competing candidate. On the face of the returns the total number of votes cast was 4,221, of which Sapulpa received 2,372, and Bristow received 1,849, giving Sapulpa a majority of 523 votes. These returns were duly certified to the Governor, whose duty under the statute was to canvass the same and declare the result, "and cause the will of the electors to be carried into effect." On this being done, this action was instituted by plaintiff, the incorporated town of Bristow, by filing a

petition on September 12, 1908, and on the issues made up the cause was referred to Charles H. Parker, Esq., as a referee, and he was directed to take the testimony and report the same to this court with his findings of fact and conclusions of law. Under the authority thus vested, the referee proceeded to hear the cause, and on January 8, 1912, duly filed his report, in which as a conclusion and summary he finds that the total vote cast should be reduced to 3,666, and that Sapulpa's vote should be reduced to 1,973, which being a majority as between it and Bristow, and a majority of the votes held to have been cast in the election, established it as the permanent county seat of the county.

The exceptions filed to the report raise issues to the returns of but three precincts. These are precincts Nos. 8 and 9 at the town of Kiefer, and precinct No. 2 in the city of Sapulpa. On the hearing before the referee in reference to the allegations concerning the conduct of the election at precincts Nos. 8 and 9, located at the town of Kiefer, a large number of witnesses were examined, and from the evidence adduced the referee found that the returns from these precincts should not be counted for any purpose; the finding being to the effect that zealous partisans and supporters of the city of Sapulpa had so far corrupted the electorate in these precincts that their candidate was not entitled to have counted for it the majority of the votes which it had there received, and also that the said corruption was of such character as to destroy the validity of the vote for any purpose, that "it is not a fair and impartial vote and is not a fair expression of the will of the people of those precincts." The referee on this matter speaks as follows:

"The evidence introduced in this case on the hearing before the referee shows that Kiefer is located in the edge of the Glenn Pool and is essentially an oil town, that the population is inclined to be of a shifting nature, and that many persons who work in the Glenn Pool at the different oil wells or engaged in the oil industry live in Kiefer or had Kiefer as their voting place at the county seat election. The evidence shows that it was no uncommon thing for beer, whisky, and other intoxicants to be offered for sale openly with very little fear of apprehension to those selling such intoxicants or any prosecution on account of the violation of the prohibition law of Oklahoma. The evidence

shows that certain 'jointists,' persons who were engaged in the illegal sale of intoxicating liquors at the town of Kiefer, were openly and avowedly in favor of the city of Sapulpa in the county seat election. The evidence shows that Kiefer is located four or five miles from Sapulpa, and about sixteen miles from Bristow, and that, before the agitation over the county seat election in Creek county became at all strenuous, certain jointists in the town of Kiefer stated that their natural preference was for the town of Bristow as the county seat for the reason that the officers of the county would be located at a greater distance from the operations of these jointists at Kiefer. That these same jointists, afterwards, when it became known that they were working for and sympathizing with Sapulpa in the county seat election, stated in explanation thereof that certain of the county officers had in effect told them that, if they did not support Sapulpa in the county seat election, they would close up their business. Evidence has been introduced tending to show that several of these jointists who operated joints in the town of Kiefer would receive information in advance when a raid would be made upon their places by officers connected with the sheriff's force, and that, when the officers arrived at Kiefer, the intoxicating liquors which these parties had in their various places would be disposed of and concealed in such a manner that there would be nothing in sight and the officers would return without confiscating any intoxicants on the raid. Evidence has been introduced showing a short time before the county seat election two excursions for the purpose of boosting the city of Sapulpa in the county seat election; one of these excursions being the day prior to the county seat election, and the other excursion being a few days previous to that. Very many of the people who came on these excursions were law-abiding citizens who came down to Kiefer with the perfectly legitimate and praiseworthy object of using what influence they could fairly and honestly to gain votes for the city of Sapulpa, and very many of the people who came on these excursions conducted themselves in an entirely becoming manner, and are not subject to criticism as to any of their actions at the town of Kiefer. But the evidence in your referee's opinion conclusively shows that, while those excursionists were in the town of Kiefer, the different 'joints' or places where intoxicating liquors were sold were wide open, were filled to their utmost capacity by persons who were in Kiefer at the time, and that beer and whisky were given away across the counters in said 'joints' without price; that anybody who wanted to get a drink could get one, and that it was at these different joints the remark was

frequently made that 'This is Sapulpa's beer,' 'This is on Sapulpa,' or 'Come and drink with Sapulpa.' Not only was this done immediately prior to election, but on election day, beer, whisky, and other intoxicants were to be had in Kiefer for the asking, and sometimes without that formality being required. On these excursions it is shown that the county judge and county attorney were both present, two of the officers who are particularly charged with the enforcement of the prohibitory law in this state. The evidence is conflicting as to whether or not these two gentlemen were in any of the 'joints,' some of the witnesses testifying that they were and some that they were not, that they did not see them in any of the 'joints' in Kiefer, and the two gentlemen in question both testified that they were not in any of the 'joints' at this place, but the evidence introduced on the hearing shows that it was a well-known fact that the prohibitory law was being violated in Kiefer, especially on the occasion of these two excursions from Sapulpa, and the records of the county court were also introduced in evidence showing that there were no arrests made for violations of the prohibitory law on those days. It is also in evidence that both the county attorney and county judge as well as the sheriff of Creek county were sympathizers with Sapulpa, and especially interested in the success of Sapulpa in the county seat contest. Numerous persons have testified that beer, whisky, and other intoxicants were given to them at these 'joints' without any testimony being given that compensation was paid by them therefor. The evidence shows that during election day persons were employed to drive hacks and to bring parties from the oil fields in to Kiefer to vote, and that generally these persons were deposited near one of the 'joints' in the city, and went into the 'joint' before going to the polling place, and, after remaining in the 'joint' for some time, they went to the polling place and voted. * * * Your referee finds from the evidence that many of the inhabitants of Kiefer were not concerned in any manner nor in any way implicated in these actions and were in no wise responsible for any of this conduct, but the fact remains that the different things done at Kiefer by persons who were interested in the success of Sapulpa in the county seat election were such as to very strongly tend to prevent a fair election at Kiefer and to prevent a fair expression of the will of the voters at the two precincts in that town. * * * Your referee finds from the evidence that beer, whisky, and other intoxicants were freely furnished for a short time prior to the election and during the day of election by persons who were sympathizers of Sapulpa to any person who desired to partake

of the same in Kiefer, and that such beer, whisky, and intoxicants were furnished for the express purpose of influencing the vote for the town of Sapulpa and against the town of Bristow, and that by reason of the action of persons engaged in an unlawful pursuit in the town of Kiefer, and by reason of the actions of their tools and henchmen, the vote had in the town of Kiefer at this election is not a fair and impartial vote, and is not a fair expression of the will of the people of those precincts."

It is not found that Bristow had anything to do with bringing about this condition. The conclusion of law of the referee on these facts was:

"By reason of the fraudulent and illegal acts committed in connection with and prior to the election therein, that none of the votes cast in these two precincts can be counted for either town, nor can they be counted in estimating the number of votes cast at this election, but should be excluded from any consideration herein."

Section 6, art. 17, par. 324, Williams' Ann. Const. Okla., provides in reference to the location and removal of county seats that, "if a majority of all the votes cast in the county at such county seat election shall be in favor of any town, such town shall thereafter be the county seat." The report of the referee discloses that there were cast in the said election 22 illegal votes which could not be counted for any purpose by reason of the fact that the parties who had cast them lacked the qualification of electors. Six of this number were cast at the precincts in question, and 25 in addition thereto were willfully exposed ballots, which, under the authority of the case of *Town of Eufaula v. Gibson et al.,* 22 Okla. 507, 98 Pac. 565, were incompetent to be considered as a part of the votes cast. Deducting this number from the total vote as shown by the returns leaves a balance of 4,174 votes cast. There was cast at the precincts in question for both parties a total of 508 votes, which, with the 47 illegal votes, made a total of 555 votes which the referee deducted from the total vote cast of 4,221, leaving as a total number of votes to be counted as votes cast the sum of 3,666. From the total number of votes cast for Sapulpa there should be deducted 399 votes made up of the votes which Sapulpa received in precinct No. 8, 140, and precinct No. 9, 234, and 25 exposed ballots

in precinct No. 2, Sapulpa, leaving it with a total of 1,973 votes to its credit, which was a majority of the votes cast, and 124 votes more than was received by Bristow after the deductions had been made, if the conclusion of the referee is accepted. The question here presented, therefore, is: Should the votes, aside from the six illegal ones which were cast at these two precincts, be deducted from the total vote received by Sapulpa, and yet be counted as votes cast? If deducted from Sapulpa's vote and yet counted as votes cast, there would be left to the credit of either of the towns less than the constitutional majority to constitute a valid election. It is a presumption accompanying all ballots that they are valid, and that the parties who cast them are qualified. The referee, with the returns from these precincts before him, investigated the same to the extent of ascertaining that six of the voters thereat were not qualified by reason of a lack of residence. These manifestly should not, as they were not, be counted for the party for whom cast, nor as a part of the total vote cast. The balance of the votes cast at that election were not rejected for the reason that these six were, nor for anything akin to it. It is not asserted, or claimed by either of the parties or found by the referee, that the balance of the electors who cast their ballots at these precincts were not qualified electors of the county by reason of a lack of any of the statutory or constitutional qualifications, but it is found that the votes cast by them should not only not be counted for Sapulpa because of the corruption perpetrated by its partisans and supporters in the election, but that the effect of the unlawful acts done was so far-reaching and insidious, and the extent of the "fraudulent and illegal acts" such, that the vote was not "a fair expression of the will of the people," totally destroying the result declared for any purpose of the election. In this conclusion of the referee we are able to but partially concur. It is fundamental that none should reap a benefit from his fraudulent and illegal acts. It is fundamental, if the partisans and supporters of a contestant in a county seat election so far corrupt the electorate that it will on detection be properly denied the benefit of the votes thereby received, that it ought not to be permitted to attain the same end

Opinion of the Court.

by having the entire vote rejected because of its fraud, where the direct result will be to award to it the fruits of its wrongs. Of what avail would it be to deny the defendant in this case the votes which its partisans had fraudulently secured for it, and at the same time reject the entire election at these precincts because of this same fraud, where the result would be the same as counting the illegally secured votes? We can see no distinction. In either event the result sought is attained and is identical. A contest for a county seat under the constitutional provision obtaining in this state presents a different character and grade of election from that which is held for the selection of public officials, for this is presumed to determine a grave question permanently, while the other recurs at brief intervals and in its very nature is of less consequence. The question is of momentous importance, not only to the particular places competing, but to every citizen, elector, and taxpayer in the county, and the Consitution guarantees to them all the right of having the county seat located by a majority of the votes cast in the county, and no contestant nor any one else has a right to so far corrupt a number of the electors as to result in thwarting the carrying out of the intent of this constitutional provision. If the conclusion reached by the referee in this cause were permitted to stand and the defendant allowed to achieve success by a decree denying to the votes cast at the precincts in question consideration as votes cast in the county, then a simple, easy method is afforded for any thrifty and unscrupulous competitor for county seat honors which is so inclined to defeat the will of the majority, and secure the county seat in any contest. It is well known that electors residing in territory tributary to a contestant usually support it. They usually want the county seat near them. To achieve success, the adversary could invade this territory on election day, and by fraud, bribery, intimidation, and by the use of intoxicating liquors, or otherwise, bring about such a condition as to cause the rejection of the returns, not only as to the few votes which it might perhaps receive, but perhaps did not expect in this unfavorable territory, but by having the votes rejected as votes cast, so reduce the number of votes cast in the

county as to enable it with a pronounced minority to show a real majority of the votes cast and counted. This hypothesis is perhaps not a likely one, but the correctness of many rules are determined by not only what has been done under them, but what may be done.

In the case of *Ryan v. Waurika,* 29 Okla. 655, 119 Pac. 220, it appeared that Waurika raised $13,000 by popular subscription to be expended by its committee in the county seat campaign; that all evidence concerning its expenditures was purposely destroyed, or no account kept; that neither the executive committee nor any witness on the stand could or would tell how any considerable portion of said sum was expended; that partisans of Waurika just prior to the election caused a large number of negroes to be detained in the town for the purpose of voting them, said committee furnishing them free board and amusement; that three different gangs of transient railroad laborers were brought from a distance and voted; that of the 115 men employed on a ditch in the town and voted it was impossible to tell how many of them voted legally, or how many were paid $2 by one of said committee, ostensibly for their day's work, but really for their vote; that all known voters thus paid were paid on written order given to each, only one of which was introduced in evidence, which was No. 203; that the challenger, watcher, and poll book holder were excluded from the polls by the election inspector contrary to law; that the voters were rushed through the voting booth in blocks of five and at an unusual rate of speed; that partisans of Waurika with large sums of money, a part of the popular subscription, with the knowledge and consent of the executive committee, visited other voting precincts in the county on election day and spent it in influencing votes for Waurika. It was held that this was ample to sustain the finding of the referee that it was impossible to tell how much money was spent by Waurika in furthering her candidacy for the county seat for legitimate, and how much for illegitimate, purposes, and that the fraud disclosed was sufficient to destroy the value of the returns as evidence and justified the referee in so holding in effect, and in setting the same aside and proceed-

ing to purge the poll. And thereupon the contesting towns entered into a purge of the poll and each town claiming the benefit of any of the votes was required to prove them. On the rejection of the returns in these precincts, neither party offered to make a purge of the poll, and, indeed, it is doubtful from the character of the influences which were brought to bear whether a satisfactory purge could have been made.

In the case of *Tecumseh et al. v. Shawnee et al., post,* 126 Pac. 440, likewise a county seat contest, this court again held on a rejection of the returns the burden to be upon the city claiming to have been selected at the election as the county seat to show that fact by evidence outside of the returns. In that case it appeared that one city offered its city hall for courthouse purposes for a period of ten years for $100, when it was in fact worth $30,000, that it collected and spent $20,000, of which no record was kept, which was intentionally handled in such a manner that to whom it was paid or for what purpose could not be ascertained from any record; that from the manner in which the said fund was handled it was impracticable, if not impossible, to determine the extent of its corrupt influences upon the electorate of the county, and that by reason of this fraud and corruption the result of the election was left in inextricable doubt, and that the will of the uncorrupted voters of the county could not be ascertained from the returns of the election.

In each of the foregoing cases, for the reasons assigned therein, the election was held to have failed in a choice, and in our judgment this, under all of the circumstances presented, should be our holding in the case at bar, for the votes cast at Kiefer, aside from the six mentioned as being illegal, should have been counted as votes cast, which leaves both towns without a sufficient majority.

This holding is one which must appeal to all as being just. It does not result in foreclosing the matter, but leaves it open for another election which may be held free from the objectionable features of this one. It gives the electorate of the county an opportunity to vote again on this important question, at which election the mistakes made in the first one may be avoided. To

accomplish this result the court is justified in so construing the provisions of the election laws that the real voice of the people may be honestly heard and recorded, and that it may not be thwarted by the unlawful practices of any one. .

The conclusion which we have reached on this point relieves us of the necessity of considering and deciding the questions raised as to precinct No. 2 in the city of Sapulpa. The statutes of the state in conjunction with the recent decisions of this court on these questions ought to render the duty of the election officials sufficiently clear as to relieve the next election of a repetition of the grounds for complaint which appear in this one.

It follows, therefore, that, as neither town received the requisite majority of all the votes cast, another election should be called pursuant to the prayer of the petition already filed upon which the election was called, pursuant to section 6 of article 17 of the Constitution, at which election these same towns are to be candidates and the town receiving a majority of the votes cast at such election shall be the county seat of Creek county.

TURNER, C. J., and HAYES, WILLIAMS, and KANE, JJ., concur.